# United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 97-2518
_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| William Henry Hester, | * | |
| | * | |
| Defendant-Appellant. | * | |

_____          Appeals from the United States

District Court for the

No. 97-2519        Western District of Missouri.

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | |
| v. | | * |
| | * | |
| Billie Dean Sullivan, | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

No.  97-2896
_____

```
                                        *
United States of America,               *
                                        *
          Plaintiff-Appellee,           *
                                        *
     v.                                 *
                                        *
Thomas Allen,                           *
                                        *
          Defendant-Appellant.          *
```

_____

Submitted:  December 9, 1997
                    Filed: March 30, 1998
_____

Before BOWMAN, FLOYD R. GIBSON, and HANSEN, Circuit Judges.
_____

HANSEN, Circuit Judge.

William Henry Hester, Billie Dean Sullivan, and Thomas Allen, along with several others, were charged with participating in a conspiracy to manufacture and to distribute methamphetamine.  In this direct criminal appeal, Hester, Sullivan, and Allen challenge their convictions and sentences, asserting that the district court[1] committed several errors.  We affirm.

---

[1]The Honorable Russell G. Clark, United States District Judge for the Western District of Missouri.

Viewing the evidence in the light most favorable to the verdicts, a reasonable jury could have found the following facts. The conspiracy at issue in this case began when Randy Shultz and Lorinda Mason[2] agreed to manufacture their own methamphetamine because they were methamphetamine users having difficulty obtaining it from other sources. They obtained a recipe and collected the necessary supplies, including ether gathered from cans of starting fluid, sodium metal, and Sudafed pills. In April 1995, after the supplies had been gathered, defendant Billie Sullivan came to the residence to teach Shultz and Mason how to manufacture methamphetamine. On that first occasion, they manufactured approximately an ounce or two of methamphetamine. Mason took pictures of Shultz and Sullivan proudly displaying their newly manufactured methamphetamine, and then they distributed it among themselves. Mason and Shultz kept half, and Sullivan took the remaining half with him when he left. Between April and June 1995, Sullivan helped manufacture methamphetamine with Shultz four or five times. Whenever they manufactured it together, Sullivan kept half of what was produced.

On June 28, 1995, law enforcement officers executed an arrest warrant for Shultz at his residence. While the officers were inside the home, they conducted a security sweep and discovered the methamphetamine laboratory. They obtained a search warrant for the property and continued investigating the activities on the property. The methamphetamine activities on the property slowed down immediately, but the operation continued. A few days later, Shultz and defendant Thomas Allen began manufacturing methamphetamine again at Shultz's residence. Mason moved out of the property for a brief time but moved back in August 1995.

---

[2]Mason pleaded guilty prior to the trial and testified on behalf of the government, providing detailed descriptions of the nature and scope of the conspiracy.

Also in August 1995, Allen and his four children moved into the Shultz residence and Mason testified that she, Shultz, and Allen agreed to use Allen's four children as a front for the methamphetamine operation to make it appear that Shultz no longer lived there. They moved the manufacturing lab out to the barn at this point. Allen helped cook the methamphetamine on occasion and also supplied Shultz with sodium metal, starting fluid, and other chemicals. Sodium metal was one of the main ingredients in these early operations, but it was difficult to obtain.

In the Fall of 1995, Shultz began paying James Carter to supply some needed ingredients. Carter was a methamphetamine user, and by May or June of 1996, he was also helping Shultz cook the methamphetamine. Another supplier was John Gray. Mason testified that she believed John Gray was obtaining sodium metal from defendant William Henry Hester, because she once saw Gray obtain sodium metal at a house where she later visited Hester and his wife.

Hester testified that he was a methamphetamine addict, that he had once traded sodium metal to Gray in exchange for methamphetamine, and that Gray introduced him to Shultz in April 1995. In July 1995, Hester went to work for Shultz on the farm in exchange for a little money and all the beer and methamphetamine he wanted. Mason testified that Hester also participated in the manufacturing operation. Hester developed a method for quick-drying the methamphetamine. Hester moved onto the Schultz farm with his wife and two children in November or December 1995. While they were living there, Mason took photographs of Hester and his family members, including his two small children, in the presence of large platters of methamphetamine.

In January 1996, Shultz, Mason, and Sullivan discovered a new manufacturing method, using lithium metal obtained from lithium batteries instead of the difficult to obtain sodium metal they had been using. Mason testified that they all thought this new method would enable them to make a lot of money. After this discovery, they were able to make methamphetamine once or twice a week. Hester testified he was aware

that many people were coming and going at the Shultz farm to purchase methamphetamine.

Hester had a set of the conspirators' recipes, but he did not remain active in the cooking process. Instead, he became the look-out man and provided security for the operation. While the cooks were manufacturing methamphetamine, Hester would scan police radios to detect police activity and watch for people coming onto the property with the aid of binoculars and night vision equipment. Shultz's sister, Cheri, who distributed methamphetamine obtained from her brother, said she observed Hester acting as the lookout man for the methamphetamine operation.

Gary Vest was a methamphetamine user supplied by his half-sister, Patricia Bristol. Shultz was Bristol's source of methamphetamine. Vest began participating in the conspiracy by obtaining supplies, and he once accompanied Hester and Shultz on a delivery of methamphetamine to someone at a garage in Springfield, Missouri. Vest once experienced Hester acting as the security for the operation. On that occasion, Hester threatened Vest with a gun when he thought Vest was taking methamphetamine from Shultz's bedroom without permission.

Hester admitted that he was somewhat of a lookout person. He said he entered this role because he feared someone might try to take his children and use them in an effort to get at the methamphetamine. Hester maintained his only interest as a lookout was to protect his family. He asserted he was a mere user and not part of the conspiracy to distribute or to manufacture methamphetamine.

In March 1996, officers arrested Shultz and Mason and executed additional search warrants. They seized photographs of the defendants proudly displaying the methamphetamine they had manufactured. The photographs were taken at Shultz's residence and pictured Shultz, Sullivan, and Hester with platters full of methamphetamine. Hester's two small children are also shown in some of the pictures

along with weapons and methamphetamine. Officers also seized ingredients and recipes for making methamphetamine, a notebook describing the methamphetamine production processes, a night vision device, and a list of police radio frequencies, among other things.

Count one of the third superseding indictment charges Shultz, Mason, Hester and his wife, Allen, Sullivan, Bristol, Vest, and Carter with engaging in a conspiracy to manufacture and to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846 (1994). The remaining four counts of the indictment were single counts against Shultz, Hester's wife, and Carter, charging them with attempting to manufacture methamphetamine. Prior to trial, Shultz, Mason, Bristol, and Vest pleaded guilty to count one. Hester's wife pleaded guilty to a misdemeanor charge of possession of a controlled substance.

Hester, Sullivan, Allen, and Carter proceeded to trial. The jury convicted Hester and Sullivan of count I but could not reach a verdict as to Allen and Carter. Subsequently, Carter pleaded guilty to a different charge (use of a communication facility in the commission of a drug trafficking offense). Following a retrial of Allen, a jury convicted him of the count one conspiracy. The district court sentenced Hester to a 360-month term of imprisonment, sentenced Sullivan to a 121-month term of imprisonment, and sentenced Allen to a 188-month term of imprisonment; each sentence to be followed by a five-year period of supervised release.

In this appeal, Hester contends that the district court erred by refusing to give an instruction on his theory of defense, by making a prejudicial statement to the jury, and by allowing certain photographs to be admitted depicting his minor children in the presence of illegal substances. Sullivan argues that the district court erred by failing to grant his motion for judgment of acquittal because a variance existed between the superseding indictment and the proof, and because the evidence at trial failed to demonstrate that Sullivan agreed to the common purpose of the single conspiracy.

Finally, Allen challenges his sentence, arguing that the district court failed to rule on his objections to the presentence report.

## II.

### A.  Hester's Appeal

Hester first contends that the district court erred by refusing to give an instruction on his requested theory of defense.  Hester's theory of defense was that he was a mere user of methamphetamine, not a member of the conspiracy to manufacture or to distribute.  He proffered Instruction F, which would have instructed the jury that a mere buyer-seller relationship does not establish a conspiracy.  The district court rejected this instruction, and Hester contends that this precluded him from proving his defense theory.

We review the adequacy of instructions by considering them as a whole, and we grant the district court broad discretion in formulating appropriate jury instructions.  United States v. Kouba, 822 F.2d 768, 770 (8th Cir. 1987).  A defendant is entitled to an instruction explaining his defense theory if the request is timely, the proffered instruction is supported by the evidence, and the instruction correctly states the law.  United States v. Wiggins, 104 F.3d 174, 176 (8th Cir. 1997).

Relying on United States v. Prieskorn, 658 F.2d 631 (8th Cir. 1981), Hester proffered a proposed instruction stating, "the relationship between a buyer and seller of drugs does not alone establish a conspiracy." (Hester's App. at 122.)  The district court properly refused to include this instruction because it was not supported by the evidence.  In Prieskorn, where we held the instruction should have been given, there was evidence that the defendant made only a single purchase of cocaine, that he had made no prior agreement to purchase cocaine, and that he did not know the other alleged conspirators prior to that single purchase.  658 F.2d at 636.  To the contrary, in the present case, Hester's own testimony demonstrates that he knew the conspirators,

knew they were manufacturing methamphetamine, lived with them for the very purpose of obtaining methamphetamine on a regular basis, was the lookout man for the operation, and had a standing agreement to receive all the methamphetamine he wanted.  We have held that "[t]he Prieskorn instruction is not appropriate when there is evidence of multiple drug transactions, as opposed to a single, isolated sale." Wiggins, 104 F.3d at 177; United States v. Figueroa, 900 F.2d 1211, 1216-17 (8th Cir.), cert. denied, 496 U.S. 942 (1990).  The evidence does not support Hester's proposed instruction because no reasonable juror could have believed that he was in a mere one-time buyer-seller relationship.

Additionally, the instructions given provided the jury with ample opportunity to conclude, consistent with Hester's defense, that he was not a knowing member of the conspiracy.  Instruction No. 21 provided in part as follows:

> You should understand that merely being present at the scene of an event, or merely acting in the same way as others or merely associating with others, does not prove that a person has joined in an agreement or understanding.  A person who has no knowledge of a conspiracy but who happens to act in a way which advances some purpose of one, does not thereby become a member.

(Hester's App. at 108.)  This instruction sufficiently presented Hester's defense.  The district court's choice of instructions adequately and correctly covered the substance of Hester's defense that his mere presence and actions as an addict, which may have been consistent with some purpose of the conspiracy, did not necessarily indicate that he was a member of the conspiracy.[3]  Hester's requested instruction was not supported

---

[3]Ample evidence also existed here for the district court to give an instruction allowing the jury to conclude that Hester's standing agreement to receive all the drugs he needed was part of a continuing relationship, which may be properly viewed as proof that he was a coconspirator in the drug distribution conspiracy.  See United States v. Fregoso, 60 F.3d 1314, 1327 (8th Cir. 1995) (citing with approval the buyer/seller relationship instruction from United States v. Cabbell, 35 F.3d 1255, 1259 n.1 (8th Cir. 1994), which includes language that multiple drug purchases "as part of a continuing buyer/seller relationship" may be proof that the defendant is a coconspirator in the drug distribution conspiracy).  The district court could have given this instruction, but did not.

by any evidence in the record, including his own testimony. We conclude that the district court did not abuse its discretion by refusing to give Hester's proposed theory of defense instruction.

Hester's second argument is that the district court erred by making an improper and prejudicial statement to the jury. Early in the trial, defense counsel objected to hearsay statements of alleged coconspirators offered by Lorinda Mason, whose testimony detailed the nature of each defendant's involvement in the conspiracy. At one point during her testimony, the district court stated the following:

> I think the government has proven that Hester and Allen were members of the conspiracy by the preponderance of the evidence, so any statements previously admitted made by either Shultz, Mason or Sullivan will be admissible as to Hester and Allen.

(Trial Tr. at 80-81.) Immediately, out of the presence of the jury, Hester sought a mistrial on the basis of the court's comment. The district court denied the motion for a mistrial, responding that it believed it had only commented that "the evidence presented by the government showed that the jury could find that Hester was a member of the conspiracy." (Id.) Then, in the presence of the jury, the district court made the following statement:

> Members of the jury, if I stated that the government had proven that Hester and Allen were members of the conspiracy, I misspoke. All I said was there was sufficient evidence for the jury to determine that Hester and

Allen were members of the conspiracy.  Whether or not Hester and Allen were members of the conspiracy is for the jury to determine, not the court.

(Id. at 82.)

The next morning, Hester and Allen renewed their motions for mistrial, which the court again denied.  At the close of evidence that day, the district court again cautioned the jury as follows:

> Now, in regard to out-of-court statement[s] or acts of alleged co-conspirators, it's for the Court to determine the admissibility of such statements or acts.  It's for the jury to determine just who was a member of the conspiracy.
>
> Now, if by any chance yesterday I instructed the jury that the government had proven that Thomas Allen and William Henry Hester were co-conspirators with Randy Allen Shultz and Lorinda Mason, that was a misstatement.  I think I told you that yesterday afternoon.  And as I stated earlier, it's for the Court only to determine the admissibility of evidence.  It's for the jury to make a determination who -- from the out-of-court statements and acts who are members of the conspiracy.
>
> Now, is there anyone on the jury that doesn't understand the instruction?  If so, raise your hand.
>
> All right.  I think everybody understands the instruction.

(Trial Tr. at 368.)

The district court's sua sponte ruling on the admissibility of coconspirator evidence before the jury, which included a statement that the evidence was sufficient to find by a preponderance of the evidence that Hester and Allen were members of the conspiracy, was indeed an unfortunate error.  In United States v. Bell, 573 F.2d 1040, 1044 (8th Cir. 1978), we held that the district court should rule on the admissibility of

-10-

a coconspirator's statement on the record but out of the hearing of the jury.  See Fed. R. Evid. 104(c).  Nevertheless, we believe that the district court's comment was not so prejudicial as to require a mistrial or reversal in this case.  The district court immediately offered a curative instruction, admitting that it misspoke and that the jury must decide whether the defendants were actually members of the conspiracy.  The next day, the district court again offered a curative instruction, after renewed motions for mistrial, stressing the duty of the court to rule on the admissibility of evidence and the duty of the jury to determine who was part of the conspiracy.

We have noted that the Bell procedures are flexible.  United States v. Legato, 682 F.2d 180, 183 (8th Cir.), cert. denied, 459 U.S. 1091 (1982).  Specifically, we have held that errors of ruling on the admissibility of a coconspirator's statement before the close of all evidence and errors of making the admissibility determination in front of the jury do not necessarily result in reversible error.  Id.  While in this instance, the district court did state, to Hester's prejudice, that the government had proven by a preponderance of the evidence that he was a member of the conspiracy, the court immediately corrected the mistake (after a conference at the bench) by admitting that the court misspoke.  The district court then correctly instructed the jury that it was the court's duty to determine the admissibility of the evidence and the jury's duty to determine credibility and who were the members of the conspiracy.  Hester argues that the court's curative instructions came too late, but we disagree.  The district court believed that the jurors understood the curative instruction.  Additionally, the comment and the curative instruction also applied to defendant Allen, yet the case against Allen resulted in a hung jury at the first trial.  Apparently, the jury did not feel compelled by the court's comment to conclude that Allen was a member of the conspiracy.  We are convinced that the district court's curative instructions were sufficient to purge any prejudicial effect of the court's earlier misstatement, rendering the error harmless.  See id.

Finally, Hester argues that the district court erred by permitting the government to admit into evidence certain prejudicial photographs, depicting Hester's minor children in the presence of illegal drugs and weapons. The district court denied Hester's motion in limine, which attempted to exclude two photographs. One photograph shows Hester holding his young son, who appears to be holding a handgun. On a table in the forefront of the photograph is a large platter full of a white powdery substance, which Mason testified was freshly manufactured methamphetamine. Another photograph shows Hester's wife holding their young daughter in close proximity to a platter of methamphetamine.

"A trial court has discretion to admit a relevant photograph unless it is 'so gruesome or inflammatory that its prejudicial impact substantially outweigh[s] its probative value.'" United States v. Davidson, 122 F.3d 531, 538 (8th Cir.) (quoting United States v. Petary, 857 F.2d 458, 463 (8th Cir. 1988)), cert. denied, 118 S. Ct. 639 (1997). A district court has broad discretion when ruling on the admissibility of evidence. United States v. Moore, 38 F.3d 977, 981 (8th Cir. 1994). We will not reverse the district court's decision regarding the admissibility of evidence absent a clear abuse of discretion. McCrary-El v. Shaw, 992 F.2d 809, 811 (8th Cir. 1993); see also United States v. Burton, 485 F.2d 715, 717 (8th Cir. 1973) ("The admissibility of photographs is left to the sound discretion of the trial court and will not be overturned except for a clear abuse of discretion" (internal quotations omitted)). "In the context of a conspiracy trial, district courts have particularly broad discretion in determining the nature of evidence to be admitted." United States v. Scott, 64 F.3d 377, 381 (8th Cir. 1995).

The photographs at issue were relevant to defining Hester's role in the conspiracy. The pictures were not taken by the government but by coconspirators during the course of the conspiracy, and the government seized them pursuant to valid search warrants. The pictures show Hester casually holding a child and proudly displaying large amounts of methamphetamine, which is consistent with the

government's theory that he was knowingly involved in the conspiracy to manufacture and to distribute. The pictures serve to refute Hester's claim that his only involvement was as a mere user. The pictures show him with large quantities of methamphetamine, consistent with distribution not personal use. The fact that his wife and children are in the pictures demonstrates his comfort with handling large amounts of methamphetamine in his home with the conspirators, tending to refute his claim that he was not part of the conspiracy. The pictures are prejudicial because Hester allowed himself and his children to be photographed in this context; however, they are not unfairly prejudicial and the probative value of the photographs outweighs the prejudicial effect. See Fed. R. Evid. 403. The district court did not clearly abuse its discretion by permitting the admissibility of the challenged photographs.

## B. Sullivan's Appeal

Sullivan contends that the district court erred in denying his motion for judgment of acquittal because there was insufficient evidence to support the conclusion that Sullivan was a member of the conspiracy to manufacture or to distribute methamphetamine.

> Our standard of review on this issue is quite narrow. We review the denial of a motion for judgment of acquittal based upon sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict. We give the government the benefit of all the reasonable inferences that could logically be drawn from the evidence. We must uphold the verdict if the evidence so viewed is such that there is an interpretation of the evidence that would allow a reasonable-minded jury to find the defendant guilty beyond a reasonable doubt.

United States v. Smith, 104 F.3d 145, 147 (8th Cir. 1997) (internal quotations and citations omitted).

Sullivan argues that he provided his methamphetamine manufacturing knowledge to Shultz and Mason only for their personal use, not for the large-scale distribution that became the object of the conspiracy at issue in this trial. Sullivan argues that he did not agree to participate in the single conspiracy which was ultimately proven at trial.

In count I of the third superseding indictment, the government charged Sullivan and all of the defendants with knowingly and intentionally conspiring to manufacture and to distribute methamphetamine, from at least as early as June 1995 through about July 10, 1996. At trial, the district court instructed the jury that it was not necessary for the government to prove both a conspiracy to manufacture and a conspiracy to distribute, as long as the jury unanimously agreed upon which of the two offenses was the object of the conspiracy. The district court also instructed the jury that the indictment charged the defendants with one single conspiracy, and if Sullivan was not a member of the single conspiracy charged in the indictment but of some other conspiracy between only him and Shultz, then he could not be found guilty of this charge.

"Whether a single conspiracy or multiple conspiracies exists is a question of fact for the jury to decide." United States v. Robinson, 110 F.3d 1320, 1324 (8th Cir.), cert. denied, 118 S. Ct. 432 (1997). "If the record contains evidence from which the jury could find one overall agreement to commit an illegal act, the evidence establishes a single conspiracy." United States v. Regan, 940 F.2d 1134, 1135 (8th Cir. 1991). To prove that a defendant was a member of a conspiracy to manufacture or to distribute illegal drugs, the government must demonstrate (1) that there was a conspiracy, i.e., an agreement to manufacture or to distribute, (2) that the defendant knew of the conspiracy, and (3) that the defendant intentionally joined the conspiracy. United States v. Jones, 101 F.3d 1263, 1267 (8th Cir. 1996), cert. denied, 117 S. Ct. 1346 (1997), and cert. denied, 117 S. Ct. 1966 (1997).

-14-

Considering the evidence in the light most favorable to the verdict, we conclude that the government presented sufficient evidence from which a reasonable jury could find that from the very beginning, Sullivan was a member of the conspiracy to manufacture and to distribute methamphetamine. In April 1995, Sullivan went to the Shultz residence and taught Shultz how to manufacture methamphetamine. He and Shultz cooked the first batch of methamphetamine, which produced approximately an ounce or two. He appeared with Shultz in a photograph, together showing off the methamphetamine they had produced. After manufacturing it, he and Shultz then divided the methamphetamine between themselves -- one-half to Sullivan and one-half to Shultz and Mason. This act of delivery and transfer amounts to distribution by Sullivan (and by Shultz as well), even if Shultz and Mason planned to use it only for personal use. The term "distribute" is defined by 21 U.S.C. § 802(11) to mean, "to deliver . . . a controlled substance." "Deliver" means the "actual, constructive, or attempted transfer of a controlled substance." 21 U.S.C. § 802(8). "Sharing drugs with another constitutes 'distribution' under § 841(a)(1)." United States v. Washington, 41 F.3d 917, 919 (4th Cir. 1994) (citing United States v. Ramirez, 608 F.2d 1261, 1264 (9th Cir. 1979)). See also Fregoso, 60 F.3d at 1325 (distribution of cocaine occurs when one gives cocaine to another -- no sale is required to violate the distribution prong of the statute). Additionally, from the amounts produced and kept by Sullivan, a jury could infer that he intended to further distribute his share of the methamphetamine. Sullivan returned to the Shultz residence for the purpose of manufacturing methamphetamine four or five more times between April and June of 1995.

Sullivan contends that his original conduct with Shultz and Mason was a separate conspiracy from the one proven at trial and that there was not sufficient evidence that he agreed to be a member of the larger-scale conspiracy proven at trial. To the contrary, however, the evidence at trial indicated that Sullivan also participated in later decisions with other conspirators, from which a jury could infer that he knowingly participated in the overall single conspiracy charged in the indictment. Sullivan participated in the January 1996 decision to begin making methamphetamine with

-15-

lithium, a readily accessible ingredient which would allow them to produce more methamphetamine and to make more money.  Even assuming he was not at that time aware of the scale of distribution taking place, there is ample evidence that Sullivan knew and willingly participated in Shultz and Mason's efforts to make and distribute methamphetamine.  "Once a conspiracy is established, even slight evidence connecting a defendant to the conspiracy may be sufficient to prove the defendant's intentional involvement."  United States v. Kinshaw, 71 F.3d 268, 272 (8th Cir. 1995).  The evidence is sufficient to support a reasonable juror's conclusion that Sullivan knowingly participated in the single charged conspiracy to manufacture and to distribute methamphetamine.  There was no variance between the proof offered at trial and the single conspiracy charged in the indictment.  The jury was correctly instructed on single versus multiple conspiracies.  The district court properly denied Sullivan's motion for acquittal.

### C.  Allen's Appeal

Allen challenges his sentence, arguing that the district court violated Federal Rule of Criminal Procedure 32(c)(1) by failing to rule on his objections to the presentence investigation report (PSR) prior to pronouncing his sentence.  Allen made several objections to the PSR, disputing the relevant conduct and the base offense level because he disagreed with the quantity of drugs attributed to him, disputing the adjustment for his role in the offense, and objecting to the total offense level assessed.

Rule 32(c)(1) requires the sentencing judge to give the defendant and the government the opportunity to comment on the PSR and requires the district court to "rule on any unresolved objections to the presentence report."  Further, "[f]or each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing."  Fed. R. Crim. P. 32(c)(1).  "We have consistently held that when a defendant objects to portions of the PSR, the district

court must base its findings on evidence rather than on the disputed PSR information." United States v. Mayer, 130 F.3d 338, 339 (8th Cir. 1997).

At the outset of Allen's sentencing hearing, the district court noted that Allen had submitted a number of objections to the PSR. The court specifically asked whether Allen wished to be heard on those objections. Allen responded that he would like to have all his "objections remain as stated," but he chose to specifically address the court regarding only the downward departure issue. (Allen's Sent. Tr. at 5.)

The entire hearing revolved around the downward departure issue. Allen testified concerning his family obligations and work history. The government opposed any downward departure and asked that the remaining objections be overruled based upon the trial testimony. At the close of the hearing, the government asked the court to consider a sentence within the range stated by the PSR (188 to 235 months). Allen did not object to the government's statement of the applicable sentencing range at this time. He merely requested a departure below that recommended range.

The court denied the downward departure, sentenced Allen to 188 months of imprisonment, and then gave the defendant one last opportunity to respond or object regarding the sentence. Allen's attorney responded only by requesting the court to recommend Allen for substance abuse treatment. Allen did not renew or raise any objection to the 188-month term of imprisonment, he did not request a ruling on his objection to the PSR's drug quantity determination, and he did not request a hearing on the quantity of drugs attributable to him. Because he never requested a ruling from the court on his objections to the PSR and he allowed sentencing to proceed without specifically renewing his objections to the quantity determination or offense level computation, we conclude that Allen waived these objections, and we will not consider them for the first time on appeal. See United States v. Goodwin, 72 F.3d 88, 90 (8th Cir. 1995) (holding defendant waived objections to quantity determination where he

-17-

argued only the departure issue and failed to pursue his quantity objection or request an evidentiary hearing on the issue when given opportunities to do so).

## III.  Conclusion

Accordingly, for the reasons stated above we affirm the judgments of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.