# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

Nos. 97-2012/2323

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Cross-Appellant/Appellee, | * | Appeals from the United States |
| | * | District Court for the |
| v. | * | Western District of Missouri. |
| | * | |
| Raymon Ortega, | * | |
| | * | |
| Appellant/Cross-Appellee. | * | |
| | * | |

_____

Submitted: January 14, 1998
Filed: August 4, 1998

_____

Before WOLLMAN, BRIGHT, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

Following his convictions on various drug trafficking and firearm charges, the district court sentenced Raymon Ortega to a total of 360 months of imprisonment. Ortega now appeals his convictions and sentences on several grounds, challenging certain evidentiary rulings at trial, the district court's conclusion at sentencing that he had two prior felony convictions, the district court's drug quantity determination at sentencing, and the district court's failure to make findings regarding controverted matters in the Presentence Investigation Report (PSIR). The government cross-appeals,

arguing tha                                                                    e
sentence.  We affirm in part and reverse and remand in part.

        The  evidence  at  trial  demonstrated  that  in  January  1995,  law  enforcemen
authorities                                                                    r
involvement
a  confi                                                                       g
underc        as individuals wanting to purchase methamphetamine.   The prearranged
        g place was located one-half mile from Ortega's residence.  Acton testified that
prior to the deal, he went to Ortega's residenc
methamphetamine                                                                d
Acton to take it wit
paid
he would be delivering the money to his drug source.  Acton testified that he delivered

        Trooper Banasik arranged another meeting with Acton to occur January 25, 1995,
                                    es of methamphetamine.  Acton testified that he
had              methamphetamine for this deal from Ortega's room at the Residence
Inn in Springfield on the previ
present.  Acton said that on this occasion,  he saw a black hollow tube in Ortega's room
     Ortega boasted that it contained 28 ounces of methamphetamine.  Acton did no
actually                                                                       d
deliv      it to Trooper Banasik on January 25, 1995, as planned.  At this meeting,

Trooper Banasik arranged a third meeting to take place on January 28, 1995, for the purpose of purchasing yet a larger amount of methamphetamine. On that day, Acton delayed in delivering the methamphetamine Banasik had ordered. Trooper Banasik contacted Acton about the deal, and Acton assured Trooper Banasik that his source had the methamphetamine but was having car trouble, which caused the delay. Acton contacted Ortega, and the two made arrangements to transfer the methamphetamine that night at a Wal-Mart parking lot. First, Acton obtained the purchase money from Trooper Banasik at a McDonald's restaurant across the highway from the Wal-Mart store. Acton then waited for his source in the Wal-Mart parking lot, where a police surveillance team was monitoring the transaction and preparing to make arrests.

Ortega's girlfriend, Hoopes, drove Ortega to the Wal-Mart parking lot where they parked next to Acton's truck. When Ortega got out of the car and opened the hood, the surveillance team moved in and arrested all three suspects. Anthony Grootens, a special agent for the Drug Enforcement Administration, interviewed Ortega, who admitted that he had approximately seven ounces of methamphetamine under the hood of his car. Ortega told Grootens that he obtained methamphetamine from three laboratories--one in Arkansas, one in Southern Missouri, and one in Oklahoma. Ortega also admitted he had been receiving about one and one-half pounds of methamphetamine every week or so (possibly for the last 18 months) at a price of $16,000 per pound. By offering this information, Ortega gave some indication that he was willing to cooperate in the investigation, but he refused to name the individuals he worked for unless the agents would promise his own release, which they did not agree to do.

The agents seized two pipes and one plastic wrapped bundle from under the hood of the car in which Ortega arrived. Two small plastic bags containing methamphetamine were hidden in the pipes, and the plastic wrapped bundle contained 13 syringes. Agents seized a cloth bag containing five handguns from the back seat of

the                                                                                     y
found no controlled substances or drug-related currency at Ortega's residence, they
                                    boxes, and a black bag containing notebooks referencing
what                                                                          f
methamphetamine sold or available.


        e government charged Ortega, Acton, and Hoopes in a six-count indictment.
Count one
1994  throu                                                                              .
Counts two and three charged Ortega and Acton wi
January 16 and 25, 1995, and count four charged all three with attempting to distribute
                            on January 28, 1995, in violation of 21 U.S.C. §§ 841(a) and 846,
                                    e charged Ortega with using and carrying firearms during
and         tion to a drug transaction, in violation of 18 U.S.C. § 924(c).  Count six
                            being a felon in possession of a firearm, in violation of 18 U.S.C.
§§ 922(g) and 924(a)(2).  Acton
count of distribution in exchange for dismissal of the other counts against him.  Ortega



        At trial, Acton testified against Ortega pursuant to his plea agreement and named
                                                                             igation and
survei        testified to the facts set forth above.  Afton Ware, a chemist for the
            Highway Patrol and expert witness for the government, testified that th
substances                                                                       y
found Ortega guilty on all counts.


                                    e the count five conviction for using and
carrying a firearm in relation to a
on the remaining counts.  Ortega objected to the government's listing of two prior felony

sentenced Ortega to 360 months of imprisonment for each of counts one, two, three, and four, all to run concurrently; and 120 months of imprisonment on count six, also to run concurrently. Ortega now appeals his convictions and sentences.

## II. Trial Issues
### A. Scope of Cross-Examination

Ortega first argues that the district court erred by limiting the scope of his cross-examination of codefendant Larry Acton. Ortega argues that the district court improperly restricted his cross-examination attempts to show bias or a motive to lie on the part of Acton, in violation of Ortega's right to confrontation.

"Absent a clear abuse of discretion and a showing of prejudice, we will not reverse a district court's ruling limiting cross-examination of a prosecution witness on the basis that it impermissibly infringed [the defendant's] right of confrontation." United States v. Stewart, 122 F.3d 625, 627 (8th Cir. 1997). The right to cross-examination is secured by the Confrontation Clause of the Sixth Amendment, which guarantees an accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This constitutional guarantee secures an *opportunity* for effective cross-examination. Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986). The Supreme Court has "recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." Davis v. Alaska, 415 U.S. 308, 316-17 (1974). The defendant's right to confront witnesses, however, "'does not prevent a trial judge from placing [reasonable] limits on defense counsel's cross-examination of government witnesses,'" and the court has wide latitude to impose such limits. United States v. Brown, 110 F.3d 605, 611 (8th Cir. 1997) (quoting United States v. Willis, 997 F.2d 407, 415 (8th Cir. 1993), cert. denied, 510 U.S. 1050 (1994)).

The district court allowed Ortega to extensively cross-examine Acton regarding the terms of his plea agreement but sustained some of the government's objections. At one point, the Assistant United States Attorney (AUSA) objected on the basis of attorney-client privilege when Ortega's counsel asked Acton, "[a]nd your lawyer made it very clear that his focus was negotiating the best deal he could get for you; isn't that right?" (Trial Tr. at 214.) The district court sustained the objection. Later, Ortega's counsel questioned, "Your lawyer explained other things about the Sentencing Guidelines, didn't he?" (Trial Tr. at 219.) The AUSA again objected on the basis of the attorney-client privilege, and again the district court sustained the objection. Ortega's counsel then rephrased his question and elicited Acton's understanding that under the Guidelines, a greater amount of controlled substances will yield a higher sentence.

Ortega asserts that the district court abused its discretion by sustaining these objections because the AUSA had no standing to assert Acton's attorney-client privilege. While we agree that the AUSA had no standing to raise an objection on this basis, we conclude that any error that may have occurred was harmless and not reversible error. Ortega claims that the questions were merely aimed at exposing Acton's understanding of the plea agreement and negotiations. Ortega elicited an answer by rephrasing the question after the second objection and could have done the same after the first. Our review of the record indicates that the district court gave Ortega ample opportunity to discredit Acton's testimony by exploring Acton's understanding of his plea agreement and negotiation process.

Ortega also complains that he was not able to show the jury Acton's understanding of his obligations under the plea agreement or his motive for testifying. Acton's plea agreement included a stipulation (not binding on the district court) that the amount of d-methamphetamine attributable to Acton was at least 100 grams but less than 400 grams, an amount which includes all of the methamphetamine Acton distributed to Trooper Banasik, not just the amount from the count to which he pleaded

-6-

guilty. Ortega attempted to show that Acton would have been accountable for a greater quantity of methamphetamine had the government not dismissed the conspiracy count. The AUSA objected to this line of inquiry, asserting that the government did not limit the amount of methamphetamine attributable to Acton. The district court sustained the objection and explained, "I will permit you to ask him if the plea agreement includes all of the meth that he distributed or was responsible for distributing. I will permit you to ask that. And I will permit you to ask how much was it. . . . He's already answered that the amount of drugs is important in determining the base offense level." (Trial Tr. at 223.) Ortega chose not to ask these permissible questions. We see no abuse of discretion in the district court's ruling. The only real limit placed on the testimony is summed up in the district court's statement that "[t]his defendant will not be chargeable with more methamphetamine than he was responsible for distributing." (Id.) The jury was informed that Acton received a sentencing benefit from the government's dismissal of the conspiracy count. Acton testified that he understood he was not subject to a mandatory minimum sentence under the terms of his plea agreement whereas the conspiracy count would have subjected him to a five-year mandatory minimum sentence. He also indicated his understanding that a greater amount of controlled substances would subject him to a greater sentence. Ortega's counsel was allowed to discuss all of the terms and conditions of Acton's plea agreement before the jury.

Ortega argues he was precluded from showing that Acton had a motive to lie in an attempt to satisfy the prosecution and obtain a substantial assistance downward departure motion. This assertion is contrary to the record in this case. The district court allowed Ortega's counsel to elicit Acton's understanding that he was expected to fully cooperate with the prosecutor, that he must provide substantial assistance, which he understood to mean that he must give information that makes a difference in the case, and that if he fulfills his end of the deal, the government promised to ask the district court to sentence him at a level below what is required by the Sentencing Guidelines. Ortega's counsel also elicited from Acton his understanding that only the AUSA can determine whether he fully cooperated and provided substantial assistance.

Thus, Ortega's cross-examination of Acton sufficiently exposed to the jury the possibility that Acton might be motivated to lie in an attempt to help secure Ortega's conviction and thereby please the prosecutor and reduce his own sentence. The district court did not unreasonably restrict cross-examination.

In sum, cross-examination concerning Acton's plea agreement was extensive and revealed Acton's understanding of the effect of his plea agreement on any sentence that might be imposed upon him. The district court did not abuse its discretion by limiting the scope of cross-examination of this government witness and any error in sustaining the AUSA's objection on the basis of attorney-client privilege was harmless in light of the extensive cross-examination allowed for this witness.

B. Expert Witness Testimony

Ortega contends that the district court abused its discretion in allowing the government to present the testimony of undisclosed expert witnesses which he contends surprised him and denied him a fair trial. "Expert testimony is admissible where it will assist the trier of fact." United States v. Sparks, 949 F.2d 1023, 1026 (8th Cir. 1991), cert. denied, 504 U.S. 927 (1992); Fed. R. Evid. 702. The Federal Rules of Criminal Procedure provide that, upon the defendant's request, the government must disclose a written summary of expert testimony that the government intends to offer at trial. Fed. R. Crim. P. 16(a)(1)(E). If the government fails to comply with this rule, the district court may order disclosure, grant a continuance, prohibit the government from offering the evidence at trial, or grant whatever relief the district court deems just under the circumstances. Fed. R. Crim. P. 16(d)(2). "Decisions concerning the admissibility of expert testimony 'lie within the broad discretion of the trial court' and will not be reversed on appeal unless there has been an abuse of that discretion." Jenkins v. Arkansas Power & Light Co., 140 F.3d 1161, 1165 (8th Cir. 1998) (quoting Peitzmeier v. Hennessy, 97 F.3d 293, 296 (8th Cir. 1996), cert. denied, 117 S. Ct. 1552 (1997));

see also General Elec. Co. v. Joiner, 118 S. Ct. 512, 517 (1997) (holding abuse of discretion standard is proper when reviewing the admissibility of expert testimony).

Special Agent Dillow and Trooper Banasik were listed on the government's witness list, not on its expert witness list, but they were allowed to testify both as fact witnesses and, over the defendant's objection, as experts with specialized knowledge of drug-related activities and paraphernalia. Special Agent Dillow gave expert testimony concerning substances commonly used by drug traffickers as a cutting agent to increase the volume of drugs available for sale. He testified that a common food additive found in Ortega's residence is one such substance. He also gave expert testimony to the effect that other innocent appearing items found at Ortega's residence are commonly used in drug trafficking, such as freezer bags for packaging the drugs and gram scales and digital scales for weighing the drug. Trooper Banasik provided expert testimony when he interpreted notations found in a notebook at Ortega's residence. He testified that in his opinion, the notes indicate amounts of drugs sold, the purchase price, and customer's names, though the notes do not specifically reference drugs. Ortega objected to this undisclosed testimony, but the district court overruled his objections.

We note initially that this type of expert evidence has become almost routine in drug cases and has been approved in this circuit. See, e.g., Brown, 110 F.3d at 611 (noting district court has discretion to allow law enforcement officers to testify as experts concerning drug-related activities likely to be unfamiliar to most jurors); United States v. Newton, 31 F.3d 611, 613 (8th Cir. 1994) (same); United States v. Boykin, 986 F.2d 270, 275 (8th Cir.) (same), cert. denied, 510 U.S. 888 (1993). Additionally, although Ortega's counsel objected to the expert testimony on the basis of a lack of proper disclosure, he did not object to the qualifications of the witnesses or the reliability of the substance of their testimony.

Ortega claims prejudice resulted from his inability to consult an expert of his choosing or to contact the people listed in the alleged drug notes. These complaints ring hollow in light of Ortega's failure even to request a continuance to allow him an opportunity to pursue these avenues. See United States v. Appleby, 975 F.2d 1384, 1387 (8th Cir. 1992) (finding no abuse of discretion allowing handwriting expert to testify where expert was not disclosed until a week into trial but defendant requested no continuance to hire his own expert). Ortega further claims that the government's failure to disclose the expert testimony concerning the items seized from his residence impinged on his right to intelligently decide whether or not to testify. This complaint also lacks merit. Ortega was not unfamiliar with the evidence. He did not contest the AUSA's statement during trial that every exhibit which was the subject of the officers' expert testimony had been shown to Ortega's counsel the week prior to trial in the presence of Special Agent Dillow, who had also informed Ortega's counsel of the government's intended use for the evidence. (See Trial Tr. at 27.) Thus, Ortega's decision whether to testify was not forced during trial, because he was aware of the substance of the testimony a week prior to trial. Ortega has demonstrated no facts indicating that he was surprised or unfairly prejudiced by the substance of the officers' testimony. Absent a showing of prejudice resulting from the district court's decision to admit evidence, we find no abuse of discretion. See United States v. Tibesar, 894 F.2d 317, 319 (8th Cir.) (affirming district court's decision to admit undisclosed documentary evidence where defendant showed no prejudice because he was familiar with the evidence and did not request a continuance), cert. denied, 498 U.S. 825 (1990).

III. Sentencing Issues
A. Independent Analysis of Controlled Substance

Ortega argues that the district court erred by not allowing him to do an independent analysis of the methamphetamine seized in this case to quantify the amount of d-methamphetamine (dextro-methamphetamine) or l-methamphetamine (levo-

-10-

methamphetamine) present in each sample. Under the Sentencing Guidelines in effect at the time of Ortega's offense, d-methamphetamine was treated much more harshly than l-methamphetamine. See United States v. Apfel, 97 F.3d 1074, 1075 (8th Cir. 1996) (explaining that the Sentencing Guideline's differential treatment of the two substances reflects l-methamphetamine's characteristic of "produc[ing] little or no physiological effect when ingested").[1]  It is the government's burden at sentencing to prove that the methamphetamine involved in the case was more likely than not d-methamphetamine. United States v. Behler, 100 F.3d 632, 636 (8th Cir. 1996), cert. denied, 118 S. Ct. 152 (1997).

The government's expert witness Afton Ware analyzed the controlled substances seized in this case and testified that each of the government's drug exhibits contained d-methamphetamine and some samples also contained l-methamphetamine. Even if an independent laboratory analysis of the methamphetamine seized would have demonstrated that the samples contained a greater percentage of l-methamphetamine than of d-methamphetamine, this demonstration would have no effect on the defendant's sentence. The notes to the Drug Quantity Table specify the following:

> [T]he weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance. If a mixture or substance contains more than one controlled substance, the weight of the entire mixture or substance is assigned to the controlled substance that results in the greater offense level.

---

[1]This distinction was eliminated in November 1995, because "'l-methamphetamine is rarely seen and is not made intentionally, but rather results from a botched attempt to produce d-methamphetamine.'" Apfel, 97 F.3d at 1075 n.2 (quoting U. S. Sentencing Guidelines Manual, App. C. at 423 (Nov. 1995)). Nevertheless, we apply the November 1994 Sentencing Guidelines which were in effect at the time of Ortega's offense to avoid a violation of the Ex Post Facto Clause of the Constitution. See id.

USSG § 2D1.1* (Nov. 1994).  The government has demonstrated by a preponderance of the evidence that each specimen contained at least a detectable amount of d-methamphetamine.  The more serious controlled substance found in the mixture, regardless of its percentage to the whole, determines the category of the entire quantity for sentencing purposes.  See Behler, 100 F.3d at 636-37.  An independent analysis could not have aided Ortega.

Additionally, although the government's evidence was available to Ortega for inspection and analysis at any time after its seizure, he did not seek an independent analysis of the substance until after trial and prior to sentencing.  See United States v. Holland, 884 F.2d 354, 357 (8th Cir.) (no abuse of discretion in denying mid-trial motion for continuance for an independent analysis where evidence had been available to defendant since time of seizure yet defendant did not avail himself of the opportunity), cert. denied, 493 U.S. 997 (1989).  Accordingly, we find no abuse of discretion in the district court's decision to refuse Ortega's request for independent laboratory analysis of the methamphetamine prior to sentencing.

## B.  Quantity Determination

Ortega contends that the district court erred by not making a clear finding of fact on the quantity of methamphetamine for which he was accountable after Ortega objected to the quantity determination stated in the PSIR.  "We review the district court's determination of a drug quantity for sentencing purposes for clear error."  United States v. Ayers, 138 F.3d 360, 363 (8th Cir. 1998);  18 U.S.C. § 3742(e) (1994).  The district court must make findings and "rule on any unresolved objections to the presentence report" prior to pronouncing sentence.  Fed. R. Crim. P. 32(c)(1); see United States v. Hester, 140 F.3d 753, 761 (8th Cir. 1998).  "For each matter controverted, the court must make either a finding on the allegation or a determination

that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing." Fed. R. Crim. P. 32(c)(1).

In cases where the sentencing judge also presided over the trial, an evidentiary hearing is not necessary to resolve factual objections; the court may base its findings of fact on the trial record. United States v. Wiggins, 104 F.3d 174, 178 (8th Cir. 1997). Because the sentencing judge in this case also had presided over the trial, he was free to make fact findings based on the trial record without holding an additional evidentiary hearing. Our review of the sentencing transcripts, however, indicates that the sentencing judge did not make any independent fact findings on the disputed quantity issue.

At sentencing, Ortega challenged the PSIR's determination of the quantity of methamphetamine involved in the offense. After approximately 20 pages of arguments by counsel on the proper quantity determination, the district court stated the following:

> Well, I don't think it makes any difference whether there was in excess of 1,000 grams or not. The person with two previous drug convictions, the defendant, can be sentenced from 10 years to life.
>
> There are two previous drug convictions, one in Lawrence County and one in Douglas County. And certainly there was more than 100 grams of methamphetamine, and I really feel like there was more than one kilogram of methamphetamine.

(Sent. Tr. at 44.) The government then noted that a life sentence is mandatory under 21 U.S.C. § 841(b)(1)(A)(viii), when the offense of conviction includes one kilogram or more of a mixture or substance containing a detectable amount of methamphetamine, and the defendant has two prior convictions. The court responded as follows:

-13-

Well, I said there was, undoubtedly, something under 1,000 grams, and I also stated that I felt there was more than one kilogram, and that gives some leeway as to whether or not life sentence is mandatory.

(Sent. Tr. at 45.)

The parties then gave their summations. The district court concluded, without articulating any specific findings, that under the Sentencing Guidelines, Ortega's base offense level was 38 and that his criminal history placed him in category VI, which "calls for a sentence of 360 months to life." (Id. at 48.) Apparently, the district court adopted the findings of the PSIR, which found that Ortega was responsible for over 30 kilograms of a mixture containing methamphetamine, because a base offense level of 38 results from a finding that the offense involved 30 kilograms or more of such mixture. See USSG § 2D1.1(c) (Drug Quantity Table) (Nov. 1994). Ortega's counsel immediately objected to this sentencing determination, contending that the district court had not made an independent fact finding on his objection to the PSIR's quantity determination. If the court stayed with its Guidelines determination, Ortega asked the court to sentence him at the bottom of the Sentencing Guidelines range. The court then sentenced Ortega to concurrent sentences of 360 months of imprisonment on counts one, two, three, and four (the drug counts) and a concurrent 120 month sentence (the statutory maximum) on count six (felon in possession of a firearm).

We respectfully disagree with the district court's decision to impose a sentence based upon the disputed findings articulated in the PSIR without making a specific independent finding upon the court's own review of the evidence. "We have consistently held that when a defendant objects to portions of the PSR, the district court must base its findings on evidence rather than on the disputed PSR information." Hester, 140 F.3d at 761 (internal quotation omitted). There is no indication in this record that the district court made a quantity determination based upon the evidence at trial rather than on the disputed PSIR. A specific quantity determination is necessary

-14-

to determine which, if any, statutory minimum sentence applies--a defendant with two prior drug felony convictions is subject to mandatory life imprisonment under 21 U.S.C. § 841(b)(1)(A)(viii) only if the drug trafficking offense involved one kilogram or more of a mixture or substance containing a detectable amount of methamphetamine or 100 grams or more of pure methamphetamine.

While we readily and willingly leave the specific fact finding to the district court, we note that the trial evidence did indicate some certain amounts. The January 16 transaction involved 27.98 grams of a mixture containing methamphetamine, the January 25 transaction involved 50.76 grams of such a mixture, and the January 28 transaction involved 198.14 grams of a mixture containing methamphetamine. These amounts, if accepted as fact by the district court, total 276.88 grams, far below the one kilogram required to impose a statutory mandatory minimum sentence under section 841(b)(1)(A)(viii) for a mixture containing methamphetamine. The evidence also contains Ortega's own statement to Special Agent Grootens that he had been distributing one and one-half pounds of methamphetamine per week. There is a dispute about whether Ortega also said he had been distributing that quantity over the past year and a half. The PSIR used a time period of 18 months to estimate to a total amount of approximately 53 kilograms. Eighteen months, however, exceeds the time-frame of the charged conspiracy, which the indictment alleged as spanning from July 1994 through January 1995 (approximately 7 months). Also, Ortega contends the evidence shows that Acton was not involved in any conspiracy with him until January 1995. Acton's own plea agreement set his quantity at between 100 and 400 grams of a mixture containing methamphetamine. Consequently, Ortega contends that the conduct of the conspiracy with Acton could not include more than one month's worth of the amounts indicated in Ortega's statement to Special Agent Grootens. It is the duty of the district court to resolve all such factual disputes, and it failed to do so. The district court's ambivalent pronouncements about quantity ("Well, I said there was, undoubtedly, something under 1,000 grams and I also stated that I felt there was more than one kilogram . . . .") when coupled with its apparent acceptance of the PSIR's relevant

conduct driven quantity estimate of 53 kilograms (resulting in an offense level 38) do not permit us to determine what quantity the court found attributable to the conspiracy count for statutory mandatory minimum sentencing purposes. This ambivalence as to quantity also resulted in the district court's failure to decide whether or not the statutory mandatory minimum of life imprisonment contained in 21 U.S.C. § 841(b)(1)(A) applied to Mr. Ortega. We remand for the district court to consider all the record evidence, to judge the credibility of all the witnesses and their statements, and to make the specific factual findings necessary to an independent drug quantity determination.

The government cross appeals the judgment of the district court, arguing that the court should have sentenced Ortega to a mandatory life sentence pursuant to section 841(b). The government's argument relies upon the disputed drug quantity determination stated in the PSIR. The foregoing discussion clearly indicates that we lack the predicate factual findings necessary to conclude that a mandatory life sentence would be justified. We therefore deny the government's cross-appeal.

## C. Prior Convictions

Ortega contends that the district court erred in finding he had two prior convictions for purposes of 21 U.S.C. § 841(b). This issue will arise on remand if the district court determines that Ortega is responsible for one kilogram or more of a mixture containing a detectable amount of methamphetamine, thus satisfying the quantity requirement of section 841(b). Section 841(b)(1)(A)(viii) imposes a mandatory life sentence on any defendant convicted of a violation of 21 U.S.C. § 841(a), who meets the quantity requirement of section 841(b) and who also has two prior convictions for "a felony drug offense."[2]

---

[2]A defendant who meets the quantity requirements and has no prior drug felony convictions is subject to a 10-year mandatory minimum sentence, and one who meets the quantity requirements and has one prior drug felony conviction is subject to a 20-

Section 851(a) provides that no person with prior drug felony convictions is subject to the increased penalties of section 841(b) unless the United States Attorney files an information with the court prior to trial, specifying the previous convictions which are relied upon as predicates for the increased mandatory minimum sentences. 21 U.S.C. § 851(a). Prior to Ortega's trial, the government filed an information charging two prior convictions. The information charged that in 1989, Ortega was convicted of felony possession of methamphetamine in Lawrence County, Missouri, for which he received a five-year term of imprisonment. Additionally, it charged that in 1994, Ortega was convicted of felony possession of methamphetamine in Douglas County, Missouri, for which he received a suspended sentence and three years of supervised probation.

Ortega first contends that the increased punishment of section 841(b) cannot be imposed upon him because his prior convictions were not prosecuted by indictment or waiver of indictment as required by section 851(a)(2), which provides that "[a]n information may not be filed under this section if the increased punishment which may be imposed is imprisonment for a term in excess of three years unless the person either waived or was afforded prosecution by indictment for the offense for which such increased punishment may be imposed." Ortega aptly recognizes that we rejected this argument in United States v. Trevino-Rodriguez, 994 F.2d 533, 536 (8th Cir. 1993), where we held that section 851(a)(2) requires the current offense, not the prior offenses, to have been prosecuted by indictment or waiver of indictment in order for the government to use the prior felonies to enhance the current sentence. Accord United States v. Brown, 47 F.3d 1075, 1077-78 (11th Cir. 1995); United States v. Burrell, 963 F.2d 976, 992-93 (7th Cir.), cert. denied, 506 U.S. 928 (1992); United States v. Adams, 914 F.2d 1404, 1407 (10th Cir.), cert. denied, 498 U.S. 1015 (1990); United States v. Espinosa, 827 F.2d 604, 617 (9th Cir. 1987), cert. denied, 485 U.S. 968 (1988). Ortega urges us to reconsider our holding in Trevino-Rodriguez in light

year mandatory minimum sentence. 21 U.S.C. § 841(b)(1).

of the circuit split on this issue created when the Second Circuit concluded that the language of section 851(a)(2) refers to the prior offense. See United States v. Collado, 106 F.3d 1097, 1101-03 (2d Cir. 1997), overruled by United States v. Ortiz, No. 96-1183, 1998 WL 228126 (2d Cir. May 8, 1998). Because the Second Circuit recently overruled its decision in Collado, the circuit split identified by Ortega no longer exists. In any event, we could not reconsider the issue regardless of the existence of a circuit split, because in our circuit, one panel is not at liberty to overrule the decision of another. See United States v. Reynolds, 116 F.3d 328, 329 (8th Cir. 1997). Ortega was prosecuted by indictment in this case, and thus, the requirements of section 851(a)(2) are satisfied.

Second, Ortega challenges use of the Douglas County offense for purposes of section 841(b), arguing that it did not result in a conviction under state law and thus should not count as a prior final conviction under section 841(b). In the Douglas County case, Ortega was required to serve three years of supervised probation but also received a suspended imposition of sentence, which is not considered a final conviction under Missouri state law. See, e.g., Yale v. City of Independence, 846 S.W.2d 193, 194 (Mo. 1993) (en banc) (holding a suspended imposition of sentence, unlike a suspended execution of sentence, is not a sentence or a final judgment); State v. Lynch, 679 S.W.2d 858, 860 (Mo. 1984) (en banc) (same) (overruled in part by Yale, 846 S.W.2d at 196); Barnes v. State, 826 S.W.2d 74, 75-76 (Mo. Ct. App. 1992) (same). We conclude, however, that we must determine whether the conviction is considered final under federal law.

For purposes of section 841(b), Congress has defined the term "felony" to mean any state offense classified by applicable state law as a felony. 21 U.S.C. § 802(13). In Missouri, simple possession of methamphetamine is classified as a felony offense. See Mo. Ann. Stat. § 195.202.2 (West 1996). Congress has not, however, specified whether state or federal law should be applied to define the term "conviction." "[I]n the absence of clear language to the contrary, federal law governs the application of

-18-

federal legislation." United States v. Cisneros, 112 F.3d 1272, 1280 (5th Cir. 1997); see Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 119 (1983) (noting that absent a plain indication to the contrary, we assume "when Congress enacts a statute that it does not intend to make its application dependent on state law." (internal quotations omitted)) (superseded by statute on other grounds). Several of our sister circuits have held that "deferred adjudications or probated sentences constitute convictions in the context of § 841." Cisneros, 112 F.3d at 1281; accord, United States v. Mejias, 47 F.3d 401, 403-04 (11th Cir. 1995); United States v. Meraz, 998 F.2d 182, 184-85 (3d Cir. 1993); United States v. Campbell, 980 F.2d 245, 250-51 (4th Cir. 1992), cert. denied, 508 U.S. 952 (1993); United States v. McAllister, 29 F.3d 1180, 1184-85 (7th Cir. 1994). Because Congress provided no explicit language to the contrary in section 841(b), we agree with the analysis of our sister circuits and apply federal law to conclude that Ortega's Douglas County offense and guilty plea, for which he served supervised probation and received a suspended imposition of sentence, qualifies as a prior final felony drug conviction for purposes of section 841(b).

Ortega also contends that the Douglas County conviction is not final because he has since filed a motion to withdraw his guilty plea, which is pending before the state court. (We were informed at oral argument that the state motion court had denied Ortega's motion and that the issue was on appeal.) We disagree. While a Missouri state court may permit a defendant to withdraw his guilty plea to correct a manifest injustice, Mo. R. Crim. P. 29.07, we will consider Ortega's guilty plea final until such time as the state court grants his motion. We will not allow a defendant to avoid the finality of his guilty plea for purposes of section 841(b) by merely filing a belated motion in the state court attempting to withdraw the plea.

We conclude that the Douglas County offense for which Ortega received a suspended imposition of sentence and a term of supervised probation is a prior felony conviction which has become final for purposes of section 841(b) and can be used as a prior offense to enhance any otherwise applicable statutory mandatory minimum

sentence at resentencing. In the event Ortega's motion to withdraw his plea is ultimately successful, we reserve to him the right to attack his federal sentence (if indeed an enhanced sentence is imposed on remand) pursuant to 28 U.S.C. § 2255.

## III. Conclusion

We vacate Ortega's sentences on counts one, two, three, and four and remand to the district court for resentencing on those counts after making a proper drug quantity determination under 21 U.S.C. § 841(b). In all other respects, we affirm the judgment of the district court.

BRIGHT, Circuit Judge, concurring separately.

I concur but add the following observations.

The quantity of drugs attributed to Ortega appears very imprecise. The government has the burden of proof on this issue. On remand, the trial court should consider whether Ortega's statement regarding drug quantities should be rejected as mere "puffing" to impress the government agent with an exaggerated assertion that Ortega was a high-level dealer who possessed the capacity to inform on low-level dealers and thereby receive a lesser sentence. Unfortunately, that is the way sentences are often imposed under the Guidelines. See United States v. Griffin, 17 F.3d 269, 274 (8th Cir. 1994) (Bright, J., dissenting); United States v. Jones, No. 97-1344, 1998 WL 264136, at *7-*8 (8th Cir. May 27, 1998) (Bright, J., dissenting).

The government's contention that Ortega qualifies for a mandatory life sentence seems to border on the frivolous. See majority opinion at 15-16. In my view, after reviewing the record, the government's effort to obtain a mandatory life sentence lacks any substantial merit.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.