# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-1652

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Cheryll S. Coon, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

No. 97-1665
No. 97-2886

Appeals from the United States
District Court for the
District of Western Missouri.

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Ferrell Travis Riley, | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: January 13, 1999

Filed: July 28, 1999

_____

Before LOKEN, HANSEN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.
_____

LOKEN, Circuit Judge.

Following a five week jury trial, Ferrell Travis Riley and Cheryll S. Coon were convicted of violating the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO"), by committing seven predicate acts of racketeering, five of which were separately charged. Riley was also convicted of three counts of fraud in violation of 18 U.S.C. § 2314; six Travel Act and conspiracy charges relating to the attempted bribery of an insurance commissioner and bribery of a Maryland state employee, see 18 U.S.C. §§ 371 and 1952; and one charge of obstruction of justice in violation of 18 U.S.C. § 1510. Coon was convicted of all charges except bribery of the Maryland employee. The district court[1] sentenced Riley and Coon to 108 and 87 months in prison, three years of supervised release with a special condition barring self-employment, and the payment of $850,590 in restitution. After a second trial, the jury returned forfeiture verdicts against both defendants. On appeal, Riley and Coon argue insufficiency of the evidence, newly discovered evidence, district court bias, erroneous evidentiary rulings, instructional errors, and sentencing errors. We affirm.

## I. Background and Sufficiency of the Evidence

Beginning in the late 1980s, Riley and Coon created four companies to sell surplus lines insurance and provide insurance related services -- Meadowlark Insurance Company, Commercial Indemnity Assurance Company, M&M Management Company, and Magnolia Acceptance Corporation, a premium finance company. These companies were collectively the alleged RICO enterprise. Riley effectively ran the enterprise.

---

[1]The HONORABLE JOSEPH E. STEVENS, JR., United States District Judge for the Western District of Missouri, who to our great regret has died since completing the trial and sentencings in these cases.

Coon controlled financial affairs, usually as company president. After regulators ran the insurance companies out of several States, Riley and Coon settled them in Missouri.

The trial focused on defendants' insurance activities in the early 1990s. Marketing surplus lines insurance in California, Riley and Coon collected premiums and then used the funds for other purposes, leaving numerous unpaid insurance claims and forcing corporate victims into insolvency. The government charged Riley and Coon with fraud together with bribery and obstruction offenses that constituted a pattern of racketeering activities. Defendants maintained that state insurance regulators were biased against them because they sold surplus lines, unregulated types of insurance usually provided by off-shore companies to insure high risks that licensed domestic insurers avoid. The jury found the government's charges valid beyond a reasonable doubt. We first discuss defendants' challenges to the sufficiency of the evidence, viewing that evidence in the light most favorable to the verdict and upholding a count of conviction if a reasonable jury could have found defendant guilty beyond a reasonable doubt. See United States v. Johnson, 56 F.3d 947, 956 (8th Cir. 1995).

A. The WBA Fraud. In April 1991, Commercial Acceptance Insurance Company ("CAIC") agreed that Meadowlark would sell surplus lines liability insurance under CAIC's name, with Meadowlark insuring the risks but paying 7½% of the premiums to CAIC. Though CAIC's principals explained it was not licensed to sell health insurance, Riley and Coon as authorized agents of CAIC signed a contract to provide health insurance to members of the Western Businessmen's Association ("WBA"). Between August and November 1991, WBA members paid over $1,000,000 in health care premiums that were deposited into a "M&M Management Corp. Trust Account" at the TransPacific Bank in Alameda, California. Coon transferred $649,000 out of this account, and defendants then used those funds for unrelated expenses, including bribes, personal investments, and the purchase of an insurance company. In October, CAIC learned that its name was being used to underwrite health insurance and withdrew Meadowlark's authority. In December,

Riley and Coon transferred the claims files from California to Kansas City. Insureds were told that claims would not be paid in full because all premiums had not been paid.

For this scheme, the jury convicted Riley and Coon of two counts of knowingly transporting in interstate commerce property "stolen, converted or taken by fraud." 18 U.S.C. § 2314. Each count focused on one transfer of funds from the TransPacific account. Riley and Coon argue the government failed to prove they stole or converted these funds because the account functioned as a simple business checking account in which they were the only authorized signatories. Defendants presented evidence that insurance companies pay claims from general operating assets, rather than holding collected premiums in trust for that purpose, and they argued there was no legal restriction on their use of monies in the TransPacific account. Leaving aside the fact that M&M signed a contract promising "that all [WBA] premiums collected shall be deposited promptly in a *fiduciary* bank account in the name of Insurer at TransPacific Bank," defendants' argument ignores the government's proof they violated § 2314 because the funds in the TransPacific account were initially "taken by fraud."[2] Even if M&M owned the funds in the account, title is not a defense if the funds were *procured* by fraud. See Gay v. United States, 408 F.2d 923, 926-27 (8th Cir.), cert. denied, 396 U.S. 823 (1969). Witnesses from the other parties to these transactions testified that defendants represented they were authorized to write health insurance on behalf of CAIC, knowing CAIC was not licensed to write health insurance. Riley and Coon agreed to set up a trust fund with the premiums to pay WBA members' health care claims, and then used over $649,000 of premium payments for other purposes, implementing their scheme with the two wire transfers charged in these counts. This evidence was sufficient to convict Riley and Coon of violating § 2314.

---

[2]Proof that the premium funds were taken by fraud is sufficient because, "when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." Turner v. United States, 396 U.S. 398, 420 (1970).

B. The IAC Fraud.  The third fraud count concerned a separate scheme in which the predecessor to Meadowlark, which was not qualified to sell surplus lines insurance in California, undertook to provide malpractice insurance for members of the International Association Coalition ("IAC"), a group of podiatrists formed in California.  The agreement provided that M&M Management would deposit thirty percent of the premiums into a segregated trust account "for the payment of claims losses and loss adjustment expenses only."  Disbursements from the account required two signatures, Coon as representative of M&M, and Dr. Wener for IAC.  Riley moved the account and removed the IAC signature requirement.  Coon then made interstate transfers of $201,000 out of the trust account for non-related uses.  The jury convicted Riley and Coon of violating § 2314 by making interstate transfers of $50,000 out of the trust account for IAC premiums.  Defendants argue the evidence was insufficient for this conviction because IAC's interest in the premiums reverted to defendants' enterprise when IAC failed to pay all premiums owing.  However, as the district court noted in denying their motion for judgment of acquittal, the two-signature requirement was an incident of IAC's ownership interest in the account.  In addition, Dr. Wener testified that the insurer was only entitled to trust funds remaining after all claims were paid, and a claims reviewer testified that over $140,000 in loss reserves were outstanding at the time of the transfers.  This was sufficient evidence that the transfers of these funds violated § 2314.

C. The Missouri Bribery Scheme.  Riley and Coon were each convicted of four substantive violations of the Travel Act, and of conspiring to violate that Act, for making four interstate transfers totaling $290,000 with intent to bribe the Missouri Commissioner of Insurance.[3]  It is undisputed defendants made four transfers totaling

---

[3]As relevant here, the Travel Act prohibits the intentional use of a facility in interstate commerce to distribute the proceeds of or to otherwise promote enumerated unlawful activities that include bribery.  See 18 U.S.C. § 1952.  Conspiracy to violate the Travel Act is a violation of 18 U.S.C. § 371.

$290,000 to bank accounts in Jefferson City. Riley and Coon argue the government failed to connect these payments to a bribery scheme.

Meadowlark applied to the Missouri Department of Insurance for a license to sell surplus lines insurance. In December 1990, an examiner opined that its financial condition was inadequate. Robert Weller, a business associate of Kansas City attorney Kevin Hare, testified that in April 1991, Hare and Raymond Sermon hired Weller to make scripted telephone calls. Beginning in May, Weller met with Hare and Sermon four times to receive telephone calls from Riley. Each time, Hare would receive a call from Riley and turn the phone over to Weller, who posed as the Missouri Commissioner of Insurance and worked off a script prepared by Hare and Sermon. In the first conversation, Weller "discussed the possibility of getting [Riley] licensed to write insurance in Missouri." In the three subsequent conversations, Weller as Commissioner said he could get the application through and demanded that Riley pay specific

any acts in furtherance of the attempted bribery after the wire transfers, as 18 U.S.C. § 1952(a)(3)(A) requires. We disagree. Viewing the evidence in the light most favorable to the verdict, a reasonable jury could find that defendants made each transfer with the requisite intent to further a scheme to bribe the Commissioner. Weller testified to four phone calls; Riley and Coon made four payments. Weller specifically demanded bribes in the last three calls, and bribes were paid; the jury could deduce that the payment made after the first call was also made with intent to bribe. There was also sufficient evidence that Coon knowingly aided and abetted the bribery scheme -- she transferred the money to the Jefferson City accounts, and she later made damaging admissions in a taped meeting with Riley and a former employee and government witness named James Wining. Finally, there was sufficient evidence of acts in furtherance of the bribery scheme after the transfers. There were phone calls from Coon's residence to Hare's hotel room in Jefferson City after the transfers. Riley met with Hare in October 1992 in an effort to recover the money. And a year after the transfers, Hare cooperated with the government and taped conversations in which Riley said he would never tell anyone about their deal, reassured Hare that the authorities would not bother Weller, and advised Hare how to report the money for tax purposes. Efforts to hide involvement in a bribery scheme constitute "thereafter acts" under the statute. See United States v. Admon, 940 F.2d 1121, 1125 (8th Cir. 1991).

D. The Obstruction of Justice. James Wining was a Meadowlark employee who helped incorporate Meadowlark in the Dominican Republic and helped Coon prepare unreliable financials for an affiliated insurer. On March 17, 1992, Wining quit Meadowlark, pleaded guilty to fraud charges, and began cooperating with the on-going investigation of Riley and Coon. Between March and November 1992, Riley made bi-weekly payments to Wining totaling about $25,000. M&M reimbursed Riley, and Coon had an IRS Form 1099 prepared for Wining. Wining taped conversations with Riley in which they discussed the FBI investigation. Wining testified that the payments from Riley were to "keep his mouth shut." Riley and Coon were convicted of violating

18 U.S.C. § 1510 (obstruction of justice) for paying Wining to withhold information from federal investigators.

On appeal, Coon challenges the sufficiency of the evidence to convict her of this charge, arguing that Riley made the payments and there is no evidence Wining ever spoke to her about a federal investigation. However, Coon was present at a tape-recorded meeting when Wining and Riley discussed Wining's cooperation. She was financially responsible for M&M, which reimbursed Riley for the payments and prepared a Form 1099 for Wining. Viewing the evidence in the light most favorable to the verdict, a reasonable jury could find that Coon knew Riley was paying Wining to prevent harmful disclosures to federal investigators, and that she aided and abetted the offense by causing M&M to cover up the true nature of the payments.

E. The RICO Conviction. To convict defendants of a RICO violation, the government must prove they participated in the conduct of an enterprise through a pattern of racketeering activity. See 18 U.S.C. § 1962(c); United States v. Bennett, 44 F.3d 1364, 1374 (8th Cir.), cert. denied, 515 U.S. 1123 (1995). Riley and Coon argue the government failed to prove the predicate racketeering activities. Four of the seven alleged predicate acts were the separately charged fraud, Travel Act, and obstruction of justice offenses we have already discussed. There was sufficient evidence to convict Riley and Coon of those separate offenses. That is sufficient evidence they engaged in a pattern of racketeering activity supporting their RICO convictions. See United States v. Cardall, 885 F.2d 656, 682 (10th Cir. 1989).[4]

F. Denial of New Trial for Newly Discovered Evidence. Riley and Coon moved for a new trial, alleging that newly discovered bank records show that payments totaling $674,102 were made to WBA claimants from M&M's Kansas City account in

---

[4]RICO defines "racketeering activity" to include violations of 18 U.S.C. §§ 2314, 1952, and 1510. See 18 U.S.C. § 1961(1).

1992. The district court denied the motion because this evidence would not have affected the outcome of the WBA fraud conviction and was cumulative to other trial evidence. We agree. Whether defendants decided after collecting the WBA premiums to honor part of their obligations to insureds does not weaken the government's proof that the premiums were initially "taken by fraud." Moreover, the alleged new evidence was cumulative because Riley testified at trial that he paid over $1,000,000 to satisfy WBA claims. The district court may grant a new trial "if the interest of justice so require." Fed. R. Crim. P. 33. There was no clear abuse of the court's discretion when it denied defendants' motion for new trial. See United States v. Castillo, 171 F.3d 1163, 1167 (8th Cir. 1999) (standard of review).

## II. Evidentiary Issues

A. Limits on Defense Cross Examination. Defendants next contend that their convictions must be reversed because the district court unfairly limited their cross-examination of three prosecution witnesses. Although the Sixth Amendment's Confrontation Clause guarantees defendants an opportunity for effective cross-examination, the district court retains wide latitude to impose reasonable limits. We review the limiting of cross exam for clear abuse of discretion. See United States v. Ortega, 150 F.3d 937, 941 (8th Cir. 1998), cert. denied, 119 S.Ct. 837 (1999), citing Delaware v. Van Ardsdall, 475 U.S. 673, 678-79 (1986). After careful review of the record, we conclude the court did not abuse its discretion in limiting the extent of cross examination regarding CAIC civil litigation over WBA premiums and whether the WBA insurance arrangement was an ERISA trust -- these issues were adequately explored throughout the trial. Nor did the court abuse its discretion in controlling the way in which conversation tapes could be used during the cross examination of James Wining -- the tapes were admitted into evidence, and defense counsel played them during closing argument.

B. Evidence of the Maryland Code of Ethics.  In addition to the Travel Act charges previously discussed, Riley was convicted of conspiring to violate the Travel Act by bribing the manager of the Maryland Department of Transportation's self-insurance program to approve an application in which Meadowlark would provide a surety bond and liability insurance.  The government proved that Riley paid over $17,000 to this manager from June to December 1991.  Riley testified this was compensation for work outside the manager's agency responsibilities.  The district court precluded the government from introducing into evidence the Maryland statute and Code of Ethics prohibiting state employees from taking money from persons they regulate.  However, the court permitted testimony that it was the policy of the Maryland Department of Transportation not to allow its employees to accept secondary employment from regulated persons.  Riley argues this testimony unfairly prejudiced his defense.  We disagree.  The district court adhered to its ruling that witnesses could not refer to Maryland law.  The agency's policy barring employees from accepting this kind of outside employment was obviously relevant to the issue of whether Riley's payments were bribes.  The court did not abuse its broad discretion by admitting that evidence.  See United States v.  Ballew, 40 F.3d 936, 941 (8th Cir.  1994) (standard of review), cert. denied, 514 U.S. 1091 (1995).

C. Unfair Trial.  Quoting snippets of testimony from the five-week trial, Riley and Coon argue that the district court's "actions, comments and rulings during trial were one-sided and prejudicial to the defense resulting in a fundamentally unfair proceeding."  There was no contemporaneous objection to most of the court's comments, questions, and rulings now emphasized on appeal, so those actions are reviewed for plain error.  See Williams v. Fermenta Animal Health Co., 984 F.2d 261, 263 (8th Cir.), rehearing denied, 992 F.2d 192 (8th Cir. 1993).  Many occurred outside the jury's presence.

Viewing the trial record in its entirety, we conclude that Judge Stevens did not persistently interject himself on the side of the prosecution.  Compare United States v.

Turner, 975 F.2d 490, 493 (8th Cir. 1992), cert. denied, 506 U.S. 1082 (1993), with United States v. Singer, 710 F.2d 431, 436 (8th Cir. 1983). Over the course of the trial, the court made rulings adverse to both parties and asked hard questions of both prosecution and defense witnesses. The court invariably allowed defense counsel an opportunity to ask follow-up questions. The challenged rulings were appropriate efforts to control repetitive questioning, improper foundation, and the mischaracterizing by counsel of testimony or other evidence. In short, the court acted well within its discretion to control trial proceedings. See United States v. Jackson, 29 F.3d 397, 402-03 n.5 (8th Cir. 1994).

## III. A Jury Instruction Issue

Riley and Coon defended the two counts of WBA fraud in part by contending that the funds in the TransPacific account were unrestricted and therefore defendants were free to transfer them out and use them for other purposes. The government countered with evidence the account was established as a "trust account" for the purpose of paying health insurance claims. Not surprisingly, during the trial there was much wrangling with witnesses about the significance of the trust account designation. Ultimately, defendants proposed an instruction on California trust law. The district court refused to give that instruction, explaining:

> I am not going to give that California instruction, that really collateralizes the issue and is confusing. I don't think they need it.
>
> \* \* \* \* \*
>
> I am not going to give these people a semester-long course in trust and estates as to what the law of trusts in California is.
>
> If you all can come together with some sort of a one-paragraph instruction telling them if there was, if there were special conditions on this account which were not complied with, then it was taken out of the

-11-

trust account, I will go along with you. And you ought to be able to come up with something like that but I am not going to confuse them with all the details of the law of trusts.

Nothing further was proposed to the district court on this subject, but on appeal, Riley and Coon argue the district court erred in refusing to instruct on the essential elements of a trust under California law. We disagree.

The jury was properly instructed that, to convict Riley and Coon of violating 18 U.S.C. § 2314, it must find the funds were stolen, converted, or taken by fraud and thereafter moved in interstate commerce with knowledge they were stolen, converted, or taken by fraud. As we have already noted, if the funds were initially obtained by fraud, it was no defense that they were deposited in an unrestricted bank account. The government's closing argument on the WBA fraud counts emphasized that the jury should find the premium funds were obtained by fraud and later transferred out of the account. To the extent the government's case could also be construed as charging that defendants stole or converted the funds by transferring them out of trust, the jury heard defendants' evidence there were no limitations on their use of the funds and was free to credit that evidence. Thus, the instructions provided defendants an opportunity to present their theory of the defense in closing argument. See United States v. Risch, 87 F.3d 240, 242 (8th Cir. 1996). The district court did not abuse its substantial discretion by refusing to give the proposed tangential and potentially confusing instruction on the California law of trusts.

## IV. Sentencing Issues

A. Amount of Fraud Loss. In determining defendants' Guidelines sentencing ranges, the district court increased their base offense levels by eleven levels based on its finding that the loss caused by the WBA and IAC frauds exceeded $800,000. See U.S.S.G. § 2F1.1(b)(1). This amount included the $649,090 defendants transferred out

of the TransPacific account and used for purposes other than paying WBA members' health insurance claims. Riley and Coon argue this finding is clearly erroneous because the court ignored evidence M&M paid $674,102 to or on behalf of WBA members after closing the TransPacific account. We review the district court's fraud loss findings for clear error; "as long as the determination is plausible in light of the record as a whole, clear error does not exist." United States v. Jackson, 155 F3d 942, 948 (8th Cir.), cert. denied, 119 S.Ct. 627 (1998). The amount of fraud loss for sentencing purposes is the greater of the loss defendants intended to inflict at the time of the fraud, or the actual loss, so later repayments do not necessarily affect the loss determination under § 2F1.1. See United States v. Mills, 987 F.2d 1311, 1315-16 (8th Cir.), cert. denied, 510 U.S. 953 (1993). The finding in question was not clearly erroneous.

Defendants also argue the district court improperly shifted to them the burden of proof on this issue at sentencing. We agree the government has the burden of proving the amount of fraud loss by a preponderance of the evidence. We disagree the court shifted that burden to the defense. At trial, the government introduced bank records showing that $649,090 of the $1,058,066 deposited in the TransPacific account was withdrawn by defendants in 1991 for purposes other than the payment of health care claims. At sentencing, the court admitted defendants' evidence of payments totaling $674,102 made to WBA claimants in 1992. Simply because the court found the government's evidence more persuasive on the issue of fraud loss does not mean it improperly shifted the burden of proof on this issue.

B. An Ex Post Facto Clause Issue. The district court applied § 2F1.1(b)(3)(B) of the 1995 Guidelines (now § 2F1.1(b)(4) of the current Guidelines) to increase defendants' base offense levels because they violated cease and desist orders entered against them in 1990 and 1991. Riley and Coon argue that adjustment violates the Ex Post Facto Clause. We disagree. Section 2F1.1 was the proper guideline to apply in determining the base offense levels for defendants' violations of 18 U.S.C. § 2314, and § 2F.1.1(b)(3) in the 1990 Guidelines contained the exact same upward adjustment.

-13-

C. Role in Offense.  The district court imposed role-in-the-offense upward adjustments of four levels for Riley (organizer or leader) and three levels for Coon (manager or supervisor).  See U.S.S.G. § 3B1.1.  The court specifically found that defendants and five other persons were criminally responsible participants in the RICO offense.  On appeal, Riley and Coon argue these findings are clearly erroneous.  We agree with the Seventh Circuit that the § 3B1.1 adjustment is applied to a RICO offense by looking at the overall RICO conspiracy and all its relevant conduct.  See United States v. Damico, 99 F.3d 1431, 1435-38 (7th Cir. 1996), cert. denied, 519 U.S. 1151 (1997).  Viewing the record in that light, the district court's findings that Riley, Coon, and the five other named individuals were criminally responsible for the enterprise's pattern of racketeering activities are not clearly erroneous.  See United States v. Braun, 60 F.3d 451, 453 (8th Cir.  1995).  We also reject Coon's contention there was no evidence she played a managerial or supervisory role in the offense.  She had managerial responsibility for the financial affairs of the extensive RICO enterprise.

D. Upward Departure.  The district court imposed upward departures of two levels for each defendant under U.S.S.G. § 5K2.0 based upon the unusual amount of fraud loss and the large number of fraud victims.  Riley and Coon argue the court erred by relying on factors already taken into account in the Guidelines.  We review the sentencing court's decision to depart under a "unitary abuse of discretion standard" and defer to the court on the critical issue of "whether a given factor is present to a degree not adequately considered by the Commission."  Koon v. United States, 518 U.S. 81 (1996); see United States v. Washington, 109 F.3d 459, 462 (8th Cir.  1997).

An upward departure is specifically encouraged if the loss calculated under § 2F1.1(b)(1) "does not fully capture the harmfulness and seriousness of the conduct," such as when the offense involves "the knowing endangerment of the solvency of one or more victims" or causes "reasonably foreseeable, physical or psychological harm."  U.S.S.G. § 2F1.1, comment. (n.10(c), (f)) (1995).  Here, the court heard testimony from health insurance claimants whose medical bills were never paid in full about the

consequences of those non-payments. The court heard evidence that the insurance companies controlled by defendants became insolvent. It found that defendants' actions caused $5,000,000 in debts to CAIC, $13,000,000 in debts owed by their companies, and at least $1,000,000 in unpaid insurance claims with resulting "emotional harm to sick and debilitated individuals." On this record, the upward departures were not an abuse of the court's sentencing discretion.

E. Condition of Supervised Release Banning Self-employment. We also conclude that the district court did not abuse its discretion in imposing as a special condition of supervised release that Riley and Coon "shall not be self-employed during the term of supervised release." In light of defendants' long-standing and extensive pattern of criminal racketeering activities, a prohibition against self-employment during supervised release is a restriction reasonably necessary to protect the public. See U.S.S.G. § 5F1.5(2); United States v. Choate, 101 F.3d 562, 566 (8th Cir. 1996).

F. Restitution. The criminal judgments require both Riley and Coon to pay restitution in the amount of $649,090 to CAIC. They argue those orders must be reversed because of insufficient evidence that CAIC was a fraud victim, or that CAIC suffered a loss. As we have explained in affirming the WBA fraud convictions and the findings as to amount of fraud loss, there was sufficient evidence in the record to affirm the restitution orders.

## V. Alleged Judicial Bias

Prior to trial, the district court appointed John C. Craft as monitor and then receiver of Meadowlark and other companies previously controlled by Riley and Coon whose assets were allegedly subject to criminal forfeiture under RICO. See 18 U.S.C. § 1963(a). We subsequently vacated these portions of the court's pre-conviction restraint orders. See United States v. Riley, 78 F.3d 367 (8th Cir. 1996). On the eve

of trial, Riley and Coon objected to Judge Stevens presiding at trial because the court had worked at the same law firm with Craft, was a social friend of Craft, and had ex parte communications with Craft as monitor and receiver, and because Craft was on the government's witness list and the criminal forfeiture count might ultimately be tried to the court. The court denied this request, explaining he was associated with Craft in the practice of law for about one year in the late 1960s, they saw each other socially only occasionally and not at all since Craft's appointment, the court had had no ex parte communications with Craft regarding the case, and Craft was appointed because "he is one of the two lawyers in Kansas City best qualified and experienced as insurance . . . monitor or receiver."

On appeal, after an intemperate preamble attacking Judge Stevens's integrity and fairness, Riley and Coon argue that the Judge committed reversible error by declining to recuse himself under 28 U.S.C. § 455. They do not assert that Judge Stevens had a conflict of interest mandating recusal under § 455(b) because of his prior relationship with Craft, the issue they raised in the district court. Rather, they argue Judge Stevens should have recused under § 455(a) because "his impartiality might reasonably be questioned." That issue was not raised in the district court. Therefore, it is waived -- "claims under [§ 455] will not be considered unless timely made." Holloway v. United States, 960 F.2d 1348, 1355 (8th Cir. 1992); accord Polizzi v. United States, 926 F.2d 1311, 1321 (2d Cir. 1991).

In addition, the contention is plainly without merit. Immediately after this court vacated the district court's receivership order, Judge Stevens held a pre-trial conference at which Craft as receiver raised the question whether his fees should be paid by the government, which had sought the ill-fated receivership, or the receivership estate. Judge Stevens commented that this issue "would come out in the wash in the long run when a determination is made as to forfeiture." Defendants argue this off-hand comment indicates the court was predisposed to convict. Section 455(a) "deals with

the *objective appearance* of partiality." <u>Liteky v. United States</u>, 510 U.S. 540, 553 n.2 (1994) (emphasis in original). Neither that comment nor any other comment or action by Judge Stevens during these lengthy proceedings reflects the kind of deep-seated favoritism or antagonism requiring recusal under § 455(a).

## VI. The Appeals from Preliminary Forfeiture Orders

Two days after the jury's verdict in the primary criminal trial, the district court tried the government's criminal RICO forfeiture charges to the jury, which returned a verdict forfeiting defendants' interests in the RICO enterprise companies and their proceeds from racketeering activities. Nine to twelve months later, the court issued a series of "Preliminary Forfeiture Orders" based on the jury's forfeiture verdict. Riley and Coon appeal the sufficiency of the evidence underlying those orders, referring to them as forfeiture "judgments." Rule 32(d)(2) of the Federal Rules of Criminal Procedure, adopted in 1996, provides that the district court may enter a preliminary order of forfeiture following a verdict that property is subject to forfeiture. In such cases, "[a]t sentencing, a final order of forfeiture shall be made part of the sentence and included in the judgment." When that is done, and defendant appeals from the judgment, prior case law would suggest that the preliminary order of forfeiture is an appealable part of the judgment. <u>See, e.g.</u>, <u>United States v. Pelullo</u>, 1999 WL 330422, at *6 (3d Cir. May 25, 1999); <u>United States v. Christunas</u>, 126 F.3d 765, 768-69 & n.1 (6th Cir. 1997). In this case, however, the judgments in defendants' criminal cases do not refer either to the jury's forfeiture verdict or to any preliminary forfeiture order. The preliminary forfeiture orders themselves are not judgments, and they do not purport to be final orders. As defendants and the government have neither provided us with final orders in the bifurcated forfeiture proceedings, nor explained why the preliminary forfeiture orders are appealable, we dismiss this portion of the appeals for lack of jurisdiction. <u>See</u> <u>United States v. Casas</u>, 999 F.2d 1225, 1231-32 (8th Cir. 1993), <u>cert. denied</u>, 510 U.S. 1078 (1994).

## VII. The Appeal in No. 97-2886

In November 1994, the district court entered preconviction restraining orders on assets of the RICO enterprise that the government asserted were subject to RICO forfeiture.[5] In November 1996 and March 1997, long after the criminal trial, the district court issued orders amending these restraining orders to the extent they impeded John Craft in his new capacity as insurance company liquidator operating under orders of a Missouri state court. Riley appeals these orders as procedurally improper. We have jurisdiction under 28 U.S.C. § 1292(a)(1) to review an order modifying an asset restraining order issued in a RICO conspiracy prosecution. See United States v. Floyd, 992 F.2d 498, 500 (5th Cir. 1993).

When the November 1996 and March 1997 orders were issued, Riley's interests in the companies comprising the RICO enterprise had been forfeited, at least preliminarily. Thus, we have difficulty perceiving how he has standing to challenge these orders. See Pelullo, 1999 WL 330422, at *6-7. More significantly, while noting that the November 1996 order was inadvertently filed without notice to Riley, the district court explained in the March 1997 order that any interest Riley may have in the assets to which liquidator Craft was given access was adequately protected by the provision preserving Riley's right to assert "offsets against or credits toward the satisfaction of any forfeiture orders or judgments entered in this case." We agree and therefore affirm the orders in question. In addition, we note that to the extent this issue may be intertwined with the interlocutory forfeiture orders, as to which we have no jurisdiction, it may be reviewable when a final forfeiture order or judgment is entered.

---

[5]See our opinion in Riley I for further background and the legal principles governing this aspect of the pretrial proceedings.

-18-

The judgments and orders of the district court are affirmed except that the attempted appeals from the district court's preliminary forfeiture orders are dismissed for lack of jurisdiction.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.