# United States Court of Appeals
### For the Eighth Circuit

_____

No. 22-1254

_____

United States of America,

*Plaintiff - Appellee*,

v.

Austin Nichols,

*Defendant - Appellant.*

_____

No. 22-1441

_____

United States of America,

*Plaintiff - Appellee*,

v.

Antonio Herrera,

*Defendant - Appellant.*

_____

No. 22-1477

_____

United States of America,

*Plaintiff - Appellee*,

v.

Jacob Trujillo,

*Defendant - Appellant.*

_____

No. 22-1524

_____

United States of America,

*Plaintiff - Appellee,*

v.

Mario Anthony Herrera,

*Defendant - Appellant.*

_____

No. 22-2055

_____

United States of America,

*Plaintiff - Appellee,*

v.

Jose Miguel Pena,

*Defendant - Appellant.*

_____

Appeals from United States District Court
for the Southern District of Iowa - Eastern
_____

-2-

Submitted: February 13, 2023
Filed: August 9, 2023

_____

Before LOKEN, COLLOTON, and BENTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

These consolidated appeals arise from a multi-defendant criminal case involving the Lowriders street gang in Davenport, Iowa. All five appellants pleaded guilty to a charge of racketeering conspiracy and other charges related to their activities with the Lowriders. The district court sentenced them to various terms of imprisonment. The appeals concern only the sentences imposed. We affirm the judgments for Antonio Herrera, Jacob Trujillo, Mario Herrera, and Jose Pena. We vacate the sentence of Austin Nichols, and remand his case for resentencing.

I.

The Lowriders street gang operated in eastern Iowa. Many members, including the appellants, lived in Davenport. Between 2013 and 2020, members of the Lowriders participated in shootings and assaults targeting members of rival gangs in the Davenport area. In 2014, the gang began to distribute cocaine and marijuana.

According to the evidence in these cases, the Lowriders gang was organized into a hierarchical structure: (1) high-ranking members sold cocaine and supplied marijuana to low-ranking members, directed low-ranking members to carry out violence, and organized weekly meetings; (2) mid-ranking members recruited new members, helped high-ranking members organize meetings, and engaged in more violence and drug distribution than low-ranking members; and (3) low-ranking members sold marijuana and engaged in violence with rival gang members. Low-

ranking members were instructed that when they saw rival gang members in public, they should initiate fights or shoot at the rival members.

Mario Herrera was a high-ranking member who began distributing cocaine and marijuana in 2014. He also directed the low-ranking members to engage in violence against other gangs. Lowriders contacted M. Herrera about disputes between members, and informed him when they saw rival gang members in public. M. Herrera also ran weekly meetings to discuss whether gang members were posting gang-related information on social media, to assign jobs to members, and to collect dues payments used to purchase firearms.

Antonio Herrera was a mid-ranking member. M. Herrera communicated with A. Herrera about how to lead lower-ranking gang members. A. Herrera also organized weekly meetings when M. Herrera was unavailable.

Jacob Trujillo and Jose Pena were low-ranking members. They shot at rival gang members at the direction of high-ranking Lowriders, but did not exercise any supervisory control or authority over the gang's activities.

Austin Nichols (M. Herrera's brother), disputes the level of his involvement in the Lowriders, but acknowledges that he was a member of the gang. In 2018, Nichols was tasked with organizing weekly meetings, but when he failed to do so, the responsibility fell to A. Herrera.

Several shootings figured prominently in the charges and at sentencing in these cases:

December 2013

On December 28, 2013, M. Herrera sent a text message to Nichols asking what time he finished work. When Nichols answered that he would finish around 7:30

-4-

p.m., M. Herrera responded with a request for Nichols to supply a box of ammunition: "Alrite, I need u to stop by ur crib and get tha whole box." Nichols messaged that he would "go down there after we off but the 45 ones right," and M. Herrera responded "yea." Nichols then supplied M. Herrera with a box of ammunition.

At approximately 3:00 a.m. on December 29, 2013, a Lowriders member, Salvador Zavala, shot at two members of a rival gang near Eighth Street and Sturdevant Street in Davenport. When Davenport police officers responded to the scene, they stopped a vehicle in the area that carried Zavala, M. Herrera, and two others. In the vehicle, officers found a box of .45 caliber ammunition that matched the caliber of shell casings at the shooting scene. They later found a .45 caliber pistol near the vehicle. Nichols's fingerprint was on the ammunition box recovered from the vehicle.

August 2015

In August 2015, A. Herrera, Nichols, and four others were attending a bonfire in Davenport when they were informed that a rival Latin King gang member had "disrespected" a Lowriders member. The group of six left the bonfire and drove to the residence of a purported Latin King member in Davenport. The group saw a juvenile male sitting on the front porch; someone asked whether the juvenile was a gang member, and someone stated "king killers." The juvenile said he was not in a gang and stepped inside the front door. As he began to close the door, shots fired from the vehicle left three bullet holes in the door.

After the shooting, Davenport police officers stopped the vehicle involved in the shooting. The officers observed A. Herrera in the driver's seat and Nichols in the backseat with three others. Officers found two spent shell casings in the backseat.

January 2018

On January 26, 2018, a Lowriders member was shot and killed by a member of a rival gang on Warren Street in Davenport. After the shooting, M. Herrera held a meeting and stated that he wanted a rival gang member killed in retaliation. On January 28, two members of the Lowriders were driving in Davenport when they saw a rival gang member. The Lowriders rammed their vehicle into the rival member's vehicle in an effort to kill him. The Lowriders also shot at the vehicle. After the collision, passengers in both vehicles fled the scene.

To investigate the incident, police officers searched the residence of the mother of M. Herrera and Nichols on Warren Street. In the basement, the officers found a backpack containing a package of 100 grams of cocaine on top of a package containing one pound of marijuana. The fingerprints of M. Herrera and Nichols were on the drug packaging.

July 2018

In July 2018, Trujillo and another Lowriders member drove past the residence of a rival gang member in Davenport. When they saw the rival member on the porch, they turned around and parked across the street from the residence. The two men exited the vehicle and walked into the street. The rival member stepped off the porch and walked toward Trujillo. After the rivals argued in the street for a few minutes, Trujillo returned to his vehicle, retrieved a firearm, and fired at least two shots at the rival member. The shots missed the rival gang member but struck a different man in the shoulder.

June 2020

In June 2020, Trujillo was a passenger in a vehicle driving in Davenport when he recognized a person in the vehicle next to him as someone who had disrespected

a Lowriders member. Trujillo's vehicle pulled alongside the other vehicle, and Trujillo shot one of the occupants in his forearm and hip. The victim was taken to a hospital, where a doctor determined that the victim suffered two entrance wounds, but no exit wounds. The victim was later referred to a surgeon for removal of the bullets.

*

A grand jury charged Nichols, A. Herrera, Trujillo, Pena, and M. Herrera. Each pleaded guilty to a racketeering conspiracy. *See* 18 U.S.C. § 1962(d). Nichols and A. Herrera also pleaded guilty to one count of assault with a dangerous weapon in aid of racketeering for their involvement in the August 2015 shooting. *See id.* §§ 1959(a)(3), 2. Trujillo pleaded guilty to two counts of attempted murder in aid of racketeering for his role in the July 2018 and June 2020 shootings, and one count of using and carrying a firearm during and in relation to a crime of violence for the July 2018 shooting. *See id.* §§ 1959(a)(5), 924(c)(1)(A)(iii). M. Herrera pleaded guilty to conspiracy to distribute a controlled substance, based in part on his possession of two kilogram of cocaine that were seized during a traffic stop in October 2018. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(B), (b)(1)(D), 846. Pena pleaded guilty to one count of assault with a dangerous weapon in aid of racketeering, *see* 18 U.S.C. § 1959(a)(3), and one count of unlawful possession of a firearm as a felon, *see id.* §§ 922(g)(1).

The district court sentenced the appellants to terms of imprisonment as follows: Nichols, 120 months; A. Herrera, 105 months; Trujillo, 240 months; M. Herrera, 250 months; Pena, 120 months. The calculations under the sentencing guidelines were complicated, sometimes involving multiple "groups" of closely-related counts, which were then combined to reach a total offense level under USSG § 3D1.4. We discuss the details of the calculations only as necessary to resolve the specific issues raised on appeal.

II.

Nichols and A. Herrera first argue that the district court erred by treating assault with a dangerous weapon as an underlying racketeering activity when it calculated their base offense levels. When a defendant is convicted of a violent crime in aid of racketeering activity under 18 U.S.C. § 1959, the defendant's base offense level is the greater of twelve or "the offense level applicable to the underlying crime or racketeering activity." USSG § 2E1.3(a)(1), (2). Attempted murder is an underlying "racketeering activity," *see* 18 U.S.C. § 1961(1), but assault with a firearm is not. *See id.*; *United States v. Haynie*, 8 F.4th 801, 805, 807 (8th Cir. 2021)

The district court applied an offense level of thirty-three based on the "underlying crime or racketeering activity" from the August 2015 shooting. But the district court did not commit the asserted error. The court cited attempted murder, not assault with a dangerous weapon, as the underlying racketeering activity. The court determined that the conduct of the two defendants in connection with the August 2015 shooting constituted attempted murder, and applied the base offense level under USSG § 2A2.1.

Nichols and A. Herrera next argue that the district court erred in applying the attempted murder cross reference, because they did not aid and abet attempted first degree murder in the August 2015 shooting. The guideline applies where the evidence shows that "the object of the offense would have constituted first degree murder" if a victim had died. *Id.* § 2A2.1(a)(1); *see United States v. Comly*, 998 F.3d 340, 343 (8th Cir. 2021).

Attempted first degree murder is the attempt to commit a "willful, deliberate, malicious, and premeditated killing," 18 U.S.C. § 1111(a), and the offense requires a "specific intent to kill." *United States v. Greer*, 57 F.4th 626, 629 (8th Cir. 2023). "[S]hooting at a particular person, or a group of people, demonstrates a specific intent to kill." *Id.* A defendant who aids and abets an offense is punishable as a principal

who commits the underlying offense. 18 U.S.C. § 2. A defendant aids and abets a crime "if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014). An aider and abettor of first degree murder must share the "same intent" as the principal. *United States v. Wilson*, 665 F.2d 825, 830 n.6 (8th Cir. 1981).

Nichols and A. Herrera left a social gathering on the night in question with four other people. The group departed after they were informed by telephone that a member of a rival gang, the Latin Kings, had "disrespected" a Lowriders member. The group drove to a house where they believed a Latin King member lived, encountered the victim outside the home, and asked him if he was affiliated with a gang. When the victim informed the group that he was not affiliated with a gang, some unidentified members of the group declared themselves "king killers." As the victim retreated into the home and began to close the front door, someone in the vehicle fired shots and caused three bullet holes in the door near where the victim was standing. The evidence supports a finding that the principal perpetrator fired shots at the victim and acted with a "specific intent to kill." There was thus sufficient evidence to find that the shooting was an attempted first degree murder. *See Greer*, 57 F.4th at 629.

On aiding and abetting, the evidence supports the district court's finding that A. Herrera took an affirmative act in furtherance of the offense with the requisite intent. After the shooting, a police officer stopped the getaway car and found A. Herrera driving. Serving as a "getaway driver" to flee the scene of an offense is an affirmative act in furtherance of the offense. *See United States v. Taylor*, 322 F.3d 1209, 1211-12 (9th Cir. 2003); *see also United States v. Daniel*, 887 F.3d 350, 356 (8th Cir. 2018). The evidence also supported the district court's inference that A. Herrera shared the shooter's specific intent to kill when he knowingly served as driver for a shooter who sought to retaliate against a rival gang member. Therefore,

the court did not err in finding that A. Herrera aided and abetted attempted first degree murder in the August 2015 shooting.

The evidence, however, is insufficient to support the district court's finding that Nichols aided and abetted attempted first degree murder. Nichols was a backseat passenger in the vehicle from which shots were fired. The government contends that Nichols aided and abetted attempted first degree murder because he "got in a car with a gun and went looking for Latin Kings." But a defendant's presence at the scene of a crime or association with persons engaged in illegal activity is not sufficient to establish that he aided and abetted the crime. *E.g.*, *United States v. Larson*, 760 F.2d 852, 858 (8th Cir. 1985). Rather, the defendant must affirmatively act in a manner "which at least encourages the perpetrator." *United States v. Jourdain*, 433 F.3d 652, 656 (8th Cir. 2006) (quoting *United States v. Thomas*, 469 F.2d 145, 147 (8th Cir. 1972)). So supplying a firearm used in a shooting, *see United States v. Darden*, 70 F.3d 1507, 1545 (8th Cir. 1995), or transporting a shooter to or from the scene, *see Taylor*, 322 F.3d at 1211-12, may suffice to establish aiding and abetting. But there is insufficient evidence here that Nichols's act of riding in the back seat of a vehicle to the scene of the crime facilitated the offense. *See State ex rel. Juv. Dep't v. Holloway*, 795 P.2d 589, 591-92 (Or. Ct. App. 1990). Accordingly, the government did not sustain its burden to show that Nichols aided and abetted attempted first degree murder in the August 2015 shooting.

III.

Nichols argues that the district court also erred in applying the attempted murder cross reference with respect to a different calculation concerning the December 2013 shooting. *See* USSG § 2A2.1(a)(1). He maintains that he did not aid and abet attempted first degree murder by supplying ammunition that was used in the shooting.

The presence report recommended application of the cross-reference on the ground that Nichols provided ammunition to M. Herrera, and M. Herrera gave the ammunition to Zavala for use in a gang-related shooting. At sentencing, the government argued that because the Lowriders engaged in retaliatory shootings against rival gang members, Nichols "knew that at the end of that road there was going to be a shooting." The district court did not expressly find that Nichols knew the ammunition would be used in the December 2013 shooting, but concluded that the evidence "shows an attempted murder," and that the guidelines "were appropriately applied." The district court did not specify whether its reference to "an attempted murder" meant the December 2013 shooting by Zavala, the August 2015 drive-by shooting discussed above, or both.

According to the record, the shooting occurred after M. Herrera sent a text message to Lowriders member Zavala, informing him that the tires of M. Herrera's vehicles were popped. Zavala asked "[w]hat's that dude name," and M. Herrera responded with the name of a rival Latin King gang member.

On the same day, M. Herrera sent a text message asking Nichols to supply ammunition. Nichols indicated that he would do so after he finished work around 7:30 p.m. Nichols then brought the ammunition to M. Herrera. Several hours later, at approximately 2:45 a.m. on December 29, 2013, M. Herrera called Zavala. Four minutes later, Zavala called M. Herrera. At approximately 2:52 a.m., the ammunition supplied by Nichols to M. Herrera was used by Zavala when he shot at two rival Latin King gang members. One of the Latin King members was the man identified by M. Herrera in his December 28 text message to Zavala. Near the shooting, police officers stopped a vehicle that carried Zavala, M. Herrera, and two others. The evidence thus supports a finding that Zavala acted with the specific intent to kill when he shot at the victims. *See Greer*, 57 F.4th at 629.

As to Nichols, however, we conclude that the evidence is insufficient to support the district court's finding that Nichols took an affirmative act in furtherance

of the offense with the requisite intent. The government was required to establish that Nichols shared Zavala's intent. In other words, the validity of the finding rests on whether the government established that Nichols knew before the shooting that the "objective of his actions" in supplying ammunition to M. Herrera was aiding Zavala in the attempted murder. *See Wilson*, 665 F.2d at 830.

The district court did not find that Nichols knew of a plan to retaliate, or that Nichols knew that M. Herrera would supply the ammunition to be used in a shooting. Nor did the court find that Nichols knew that Zavala intended to kill someone. There is no evidence that M. Herrera told Nichols the purpose for which he wanted ammunition. In short, the evidence does not show that when Nichols provided ammunition to M. Herrera, Nichols knew that Zavala intended to use the ammunition to kill the victims in the December 2013 shooting. Circumstantial evidence about the operation of the Lowriders gang is insufficient to establish that Nichols acted with a specific intent to kill Zavala's victims when he supplied ammunition to M. Herrera on this particular occasion. Therefore, the government did not sustain its burden to show that Nichols aided and abetted attempted first degree murder in the December 2013 shooting.

Nichols also complains that the district court erred in finding him responsible for conspiring to distribute cocaine based on the seizure of 100 grams of cocaine in January 2018. The district court found that "[t]he location of the cocaine in the backpack at his mother's house with his fingerprints on the packaging" was "more than sufficient" to "tie him" to a drug conspiracy. We see no clear error in that finding. Nichols pleaded guilty to a racketeering conspiracy in which the pattern of racketeering included drug trafficking. He does not dispute that members of the Lowriders gang engaged in a years-long conspiracy to distribute cocaine. Nichols's fingerprints on a package of cocaine suitable for distribution, together with the circumstantial evidence, is sufficient to support a finding that he was responsible.

In light of our conclusions, we will vacate Nichols's sentence and remand for resentencing. Because the sentencing guidelines must be recalculated, we do not address the issue of role in the offense at this time.

## IV.

A. Herrera argues that the district court erred in applying a three-level increase for aggravating role in the offense. *See* USSG § 3B1.1(b). It is unnecessary to consider this claim of procedural error, because the finding did not affect A. Herrera's total offense level under the grouping rules. For A. Herrera's conviction on assault with a dangerous weapon in aid of racketeering, the adjusted offense level of thirty-three was based on the "underlying crime or racketeering activity" from the August 2015 shooting. *See* USSG §§ 2E1.3(a)(2), 2A2.1. A. Herrera's racketeering conspiracy offense carried a base offense level of nineteen. *See* USSG § 2E1.1. Even with a three-level increase for role in the offense, the offense level for that group was nine or more levels less serious than the offense level for the assault group, so it did not affect his adjusted offense level. *See* USSG § 3D1.4; *United States v. Omar*, 567 F.3d 362, 366 (8th Cir. 2009).

A. Herrera next contends that his sentence is unreasonable under 18 U.S.C. § 3553(a). After calculating an advisory guideline range of 121 to 151 months' imprisonment, the district court varied downward and imposed a term of 105 months. We review the reasonableness of a sentence under a deferential abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). A district court abuses its discretion by failing to consider a relevant factor, giving significant weight to an irrelevant factor, or committing a clear error of judgment in weighing the relevant factors. *United States v. Jones*, 507 F.3d 657, 659 (8th Cir. 2007).

A. Herrera contends that the district court abused its discretion by failing to consider mitigating factors, including his presentence rehabilitation, and the fact that

he felt pressured to join the Lowriders at a young age because many of his relatives were members of the gang. But the district court heard argument and allocution on A. Herrera's rehabilitation and familial ties to members of the Lowriders, and "we may presume that the court considered those factors." *United States v. Keating*, 579 F.3d 891, 893 (8th Cir. 2009).

A. Herrera also suggests that the district court incorrectly weighed the sentencing factors. He argues that when the court considered his criminal history, it should have varied further downward based on his time spent in state prison, on parole, and in pretrial detention for an Iowa conviction that was related to his conduct in the August 2015 shooting. At sentencing, the court considered the factors under § 3553(a), emphasizing the seriousness of A. Herrera's offenses, and the need for adequate deterrence and protection of the public. The court stressed that A. Herrera engaged in organized and violent criminal activity. In discussing a downward variance, the court cited A. Herrera's young age and "the fact that he has already been punished to some extent for the same behavior" as the conduct relevant to his federal convictions. The district court has wide latitude in weighing the factors under § 3553(a), and the mitigating circumstances cited by A. Herrera are not so compelling to require an even greater downward variance. The district court did not abuse its discretion.

V.

Trujillo first argues that the district court erred in calculating his base offense level under USSG § 2A2.1(a)(1) for attempted first-degree murder. He maintains that the evidence did not support a finding that he acted with premeditation in the July 2018 and June 2020 shootings. The district court found that "the facts in the presentence report," to which Trujillo did not object, showed that he attempted to commit first degree murder in each shooting. We review this finding for clear error.

-14-

An offender acts with premeditation when his conduct is the result of planning or deliberation. *United States v. Haskell*, 468 F.3d 1064, 1074 (8th Cir. 2006). Premeditation need not exist for a particular length of time, *Greer*, 57 F.4th at 629, and may be inferred from the defendant's actions. *See United States v. Slader*, 791 F.2d 655, 657-58 (8th Cir. 1986). In the July 2018 shooting, Trujillo returned to his vehicle after an argument, retrieved a firearm, and shot at a rival gang member. In the June 2020 shooting, Trujillo recognized someone who had disrespected a Lowriders member, pulled up alongside him in a vehicle, and shot at him. The district court did not clearly err in finding that Trujillo's deliberate actions before the shootings demonstrated that he acted with the requisite premeditation. *Greer*, 57 F.4th at 629.

Trujillo next argues that the district court erred in applying an increase to his base offense level for causing serious bodily injury in the June 2020 shooting. Under USSG § 2A2.1(b)(1)(B), if the victim of an attempted murder sustained a "serious bodily injury," the defendant's base offense level should be increased by two levels. A "serious bodily injury" is an "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." USSG § 1B1.1, comment. (n.1(M)). The district court found that the victim in the June 2020 shooting "suffered serious bodily injury as a result of the gunshot wound."

The victim in the June 2020 shooting was shot in the forearm and hip, and the bullets required surgical removal. Given the nature of the gunshot wounds and the medical intervention required, the district court did not clearly err in finding that the victim sustained a serious bodily injury.

Trujillo also argues that the district court clearly erred in finding that he was not a "minor participant" entitled to a two-level decrease under USSG § 3B1.2(b). He suggests that he was a low-ranking member in the Lowriders, and therefore less

-15-

culpable than higher ranking members in the gang's violent activities. The court found that although Trujillo was a low-level member of the Lowriders, his criminal conduct was "high-level," and he was "deeply involved" in the gang's violence. The court cited Trujillo's role as the shooter in July 2018 and June 2020, and declined to decrease the offense level for a mitigating role. We review the district court's finding for clear error. *United States v. Brown*, 929 F.3d 1030, 1041 (8th Cir. 2019).

To prove entitlement to the downward adjustment, Trujillo must show not only that he is a minor participant by comparison with other participants, but also by comparison with the offense for which he was held accountable. *United States v. Bandstra*, 999 F.3d 1099, 1102 (8th Cir. 2021). When a defendant is sentenced for a racketeering conspiracy conviction, his role in the offense is assessed based on his overall role in the racketeering enterprise. *United States v. Wynn*, 37 F.4th 63, 68 (2d Cir. 2022); *see United States v. Coon*, 187 F.3d 888, 899 (8th Cir. 1999). Given Trujillo's culpability with respect to the offenses for which he was held accountable, and the district court's finding that he was deeply involved in the gang's violent activities, the district court did not clearly err in finding that he was not a minor participant.

## VI.

M. Herrera first argues that the district court erred in applying the attempted murder cross-reference for the January 2018 shooting when it calculated his base offense level. There is no merit to this contention, because the district court did not apply the attempted murder cross-reference. The court determined a total offense level based solely on his drug conspiracy offense: a base offense level of thirty-two, USSG § 2D1.1(a)(5), (c)(4), a two-level increase for involving a juvenile in the offense, *id.* § 2D1.1(b)(16)(B)(i), and a four-level increase for role in the offense, USSG § 3B1.1(a), for a total offense level of thirty-eight. The court made no finding that M. Herrera's conduct constituted attempted murder, and did not increase the

-16-

offense level based on the attempted murder cross-reference. Although the presentence report recommended calculating the offense level based on two groups of closely-related counts that would have included an attempted murder finding, the district court disagreed: "I don't believe the grouping is correct here, and so I'm not applying the two levels for the grouping."

M. Herrera next argues that the district court clearly erred in determining the drug quantity for which he was accountable. His principal complaint is that the court relied on grand jury testimony from a cooperating witness, S.T., who attributed 28.5 kilograms of cocaine to M. Herrera. S.T. explained that M. Herrera gave her an ounce of cocaine every other day for about three years, and that she saw him in possession of between thirteen and fifteen kilograms of cocaine in a garage during 2017.

The district court determined that the grand jury testimony concerning M. Herrera's involvement in drug distribution was "reliable and consistent." Herrera contends that the court failed to make a specific finding on whether S.T. saw M. Herrera in possession of the thirteen kilograms of cocaine in a garage. Although there is no specific finding about the garage, we conclude that the findings are adequate. The court concluded that S.T.'s grand jury testimony supported the drug quantity determination in the presentence report, which included the thirteen kilograms that S.T. saw in the garage.

M. Herrera also urges that S.T.'s grand jury testimony was unreliable because it was inconsistent, uncorroborated, and contradicted by testimony of another witness regarding the appearance of the garage walls. A district court may consider relevant information at sentencing, regardless of its admissibility under the rules of evidence, if the information "has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a). We have said that grand jury testimony has an indicia

of reliability because it is given under oath and under penalty of perjury. *United States v. Wallace*, 408 F.3d 1046, 1048 (8th Cir. 2005) (per curiam).

The district court did not clearly err in finding that S.T.'s testimony was sufficiently reliable. S.T.'s testimony was corroborated by testimony from other witnesses who saw M. Herrera supply cocaine, and by seizures from the defendant of 100 grams in January 2018, and 2 kilograms in October 2018. *See United States v. Angeles-Moctezuma*, 927 F.3d 1033, 1037 (8th Cir. 2019). The alleged inconsistencies in S.T.'s testimony are not so substantial as to compel a finding that her testimony was unreliable. Although S.T. initially testified that she saw thirteen to fifteen *ounces* of cocaine, she corrected herself to say that she saw thirteen to fifteen *kilograms* of cocaine, and explained that the drug packaging indicated the larger quantity. Herrera criticizes as inaccurate her statement that the garage with cocaine was located on "14th and Warren," but the district court reasonably could accept S.T.'s explanation that she meant the 1400 block of Warren Street. While there was a discrepancy between S.T. and a defense witness about whether the walls of the garage were covered by drywall, the district court did not clearly err in finding that the dispute was insufficient to undermine S.T.'s credibility on drug quantity. The court did not clearly err in making its drug quantity determination.

M. Herrera also challenges a condition of supervised release that limits his contact with members of the Lowriders gang. The condition provides that he "shall not knowingly associate or communicate with any member of the Lowriders criminal street gang, or any other criminal street gang without the prior approval of the probation office." M. Herrera complains that the condition infringes on a liberty interest in associating with family members who are members of the gang.

The district court determined that "[t]he anti-gang provision here is very appropriate especially given the facts of this case." The condition is reasonably related to the pertinent sentencing factors. *See* 18 U.S.C. § 3583(d)(1)-(3). M.

Herrera was convicted of a racketeering conspiracy with a leadership role in the Lowriders gang, and the condition is a reasonable measure taken to deter recidivism and to protect the public. The special condition does not unduly restrict a liberty interest of M. Herrera's. The court did not ban all contact with family members who are involved with the gang; M. Herrera may contact these family members with prior approval of the probation office that would allow for appropriate conditions or supervision. A special condition requiring pre-approval to contact family members is not unconstitutional where circumstances warrant the precaution. *E.g.*, *United States v. Hobbs*, 710 F.3d 850, 854 (8th Cir. 2013). Here, the district court reasonably concluded that unfettered contact with gang members who are related to M. Herrera would pose an unacceptable risk of reversion into a former crime-inducing lifestyle. *See United States v. Romig*, 933 F.3d 1004, 1006-07 (8th Cir. 2019).

M. Herrera also asserts that the district court impermissibly delegated authority to the probation office when it imposed the special condition. A district court may "delegate limited authority to non-judicial officials as long as the [court] retains and exercises ultimate responsibility." *United States v. Kerr*, 472 F.3d 517, 523 (8th Cir. 2006). Herrera relies on *United States v. Kent*, 209 F.3d 1073 (8th Cir. 2000), where a district court "explicitly stated it hoped it would not be 'riding herd' in the probation officer's decision," *id.* at 1079, but the district court here made no statement indicating that it was "relinquishing final authority" over determinations about the special condition. *See Kerr*, 472 F.3d at 524. There was no improper delegation to the probation officer.

VII.

Pena's lone argument on appeal is that the district court erred in denying him a three-level decrease for acceptance of responsibility. *See* USSG § 3E1.1(b). The district court found that because Pena gave notice of his intent to plead guilty after

the court's scheduling deadline, the court continued to prepare for Pena's trial and could not efficiently allocate its resources. We review the district court's decision for clear error. *United States v. Jordan*, 877 F.3d 391, 393 (8th Cir. 2017).

The district court set a deadline of January 7, 2022, for Pena to notify the court of an intent to plead guilty. On January 7, Pena notified the court of his intention to plead guilty to counts one, fourteen, thirty-one, and thirty-two of the superseding indictment, and to proceed to trial on count thirty-three. On January 13, 2022, after the government agreed to dismiss counts thirty-two and thirty-three, Pena moved to withdraw his plea, and notified the district court of his intention to plead guilty to counts one, fourteen, and thirty-one of the superseding indictment. Although Pena notified the court after the deadline, the government moved for a three-level reduction under § 3E1.1(b).

The commentary to the sentencing guidelines provides that a district court "should grant" a motion by the government under § 3E1.1(b) in certain circumstances. A motion should be granted if the court determines that the defendant has assisted authorities by "timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." *Id.* § 3E1.1, comment. (n.6). Whatever the government's assessment about its ability to allocate resources, the court determined that Pena's notice after the scheduling deadline did not allow the court to allocate its resources efficiently. We see no basis to conclude that the court's assessment of its own resource allocation was clearly erroneous, so there was no procedural error.

\* \* \*

-20-

For these reasons, we affirm the judgments of the district court as to Antonio Herrera, Jacob Trujillo, Mario Herrera, and Jose Pena.  We vacate the sentence imposed on Austin Nichols, and remand his case for resentencing.

_____